Gary OETZMAN, Plaintiff-Respondent,

v.

David M. AHRENS, Wisconsin Council 40, AFSCME, AFL-CIO, and Local 3148, AFSCME, AFL-CIO, Defendants-Appellants.†

Court of Appeals

*No. 87–1748. Submitted on briefs May 26, 1988.—Decided June 23, 1988.*

(Also reported in 427 N.W.2d 421.)

† Petition to review denied.

For the defendants-appellants the cause was submitted on the briefs of *Bruce M. Davey* of *Lawton & Cates, S.C.,* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *Robert M. Hesslink, Jr.,* and

*Rick Lance Packard* of *Hesslink Law Offices, S.C.,* of Madison.

Before Dykman, Eich and Sundby, JJ.

EICH, J. David M. Ahrens, Wisconsin Council 40 of the American Federation of State, County and Municipal Employees (AFSCME), and AFSCME Local 3148, AFL-CIO, appeal from an order denying their motion for summary judgment dismissing Gary Oetzman's defamation action against them, and from the final judgment on the jury's verdict awarding Oetzman compensatory damages.

Oetzman, the personnel manager of the Sauk County Health Care Center, brought the action after Ahrens, a "staff representative" employed by the Council, sent two letters to Oetzman's supervisor charging that Oetzman had sexually harassed L.B., a union member and center employee. Oetzman claimed that the letters libeled him. Ahrens, the Council and the local (hereafter "Ahrens") moved for summary judgment on grounds that Oetzman, in order to prevail in his action against a labor union representative, must establish that the letters were written and sent with "actual malice" as that term is defined in *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964), and that they actually caused him harm. Ahrens maintains that the affidavits filed in connection with the motion established without dispute that Ahrens's actions were not motivated by actual malice and that Oetzman suffered no actual harm from them.

An additional issue raised on appeal is whether the truth of the letters' contents should have been included in a special verdict question and whether Oetzman must prove that the statements in the letters were false in order to prevail in the action. Because we

resolve these questions against Ahrens, we affirm the judgment and order and deem it unnecessary to consider several collateral issues briefed by the parties.

Oetzman and the health center's director had met on at least one occasion to discuss L.B.'s failure to report to work when required. They eventually decided that her employment should be terminated unless she came forth with reasons for her absence. Oetzman then asked L.B. to come to his office for an interview. He stated in this affidavit that in their half-hour meeting they discussed L.B.'s "excuses," which he found to be inadequate. When the interview concluded, Oetzman told L.B. that her employment was being terminated and that, if she wished, she could discuss the matter further with the director.

L.B. stated in her affidavit that Oetzman's office door was closed during the interview and that he asked her questions such as: "What do you think I should do with you . . . . [W]hat kind of a break do you think I should give you?" She stated that there were long silences, and that when she told Oetzman that she felt like crying, he said: "Go ahead and cry. You've got every reason to cry." She stated that he then leaned over and put his hand on hers and said: "Or do you think I should rip these forms up?"

A union steward, Margaret Maggard, filed an affidavit in support of Ahrens's motion in which she stated that she saw L.B. after the interview and that L.B. told her she felt she had been sexually harassed. The next day, Maggard met with the president of the local union, Judy Horkan, and told Horkan of her discussion with L.B. Horkan then contacted Ahrens. She told him what Maggard had told her and stated

that she thought L.B. had been sexually harassed during her interview with Oetzman.

Ahrens then talked to L.B. He stated in his affidavit that she told him she had felt a "tremendous sexual undertone" during her meeting with Oetzman. Ahrens's affidavit also states that a few weeks earlier someone, either Maggard or Horkan, had "expressed concern" about Oetzman's possible sexual harassment of other employees, such as offering to drive a female employee to work, and telling another that "he would kiss her" if she reported to work. Ahrens also claimed to have seen Oetzman put his arm around a female employee. As might be expected, Oetzman's own affidavit disputed Ahrens's "examples" of sexual harassment, whether of L.B. or any other employee.

Without investigating the matter further, Ahrens sent a letter to the health center's director stating, among other things, that:

> It has come to my attention that your Personnel Director, Gary Oetzman, has, on a number of occasions, approached employees of the Health Care Center with implicit or explicit requests for sexual favors. In the last occasion of this kind of activity [Oetzman] discharged our member, [L.B.], following a closed door interview lasting more than one hour, during which she rejected such implicit overtures.

A copy of the letter was sent to Horkan, and one was also given to the county's personnel coordinator, who conducted her own investigation, including interviews with courthouse employees with whom Oetzman frequently came into contact.

The director met with Oetzman to "investigate" the matter. He eventually concluded that there was

no evidence to support the allegations in Ahrens's letter. After a scheduling conflict prevented the director from meeting with Ahrens, Ahrens sent him a second letter charging that he had deliberately frustrated the scheduled meeting, and that such action "reveals in no uncertain terms, your refusal to deal with this most serious charge against Mr. Oetzman." Again, Ahrens sent a copy of the letter to Horkan, who posted it on the union's bulletin board at the center.

At some point, the union filed a grievance protesting L.B.'s termination. The center's board of governors, after hearing the grievance, changed the termination to a thirty-day suspension. The matter eventually went to arbitration, and the arbitrator ruled that L.B. had been suspended without just cause and ordered the suspension lifted, with back pay and benefits.

After the arbitration hearing, Oetzman, who had since left his employment at the center, wrote to the union requesting that a retraction of the letters be sent to the director for placement in his personnel file. The union refused, and Oetzman commenced this action.

The primary basis for Ahrens's motion for summary judgment was his claim that Oetzman was a "public official" and that because the letters were sent by a union representative during a "labor dispute," there could be no recovery in the absence of proof that Ahrens acted with actual malice and that his actions actually harmed Oetzman. The trial court denied the motion. However, it granted Oetzman's motion for partial summary judgment, ruling that the first letter was defamatory as a matter of law and that the union and the council were responsible for Ahrens's acts.

Just prior to trial, Ahrens requested a jury instruction on truth as a defense to the action, and the trial court denied the request. As indicated, the jury returned a verdict in Oetzman's favor, and Ahrens appealed.

*New York Times,* 376 U.S. at 279–80, established the rule that a public official can recover damages for defamation by the press only upon a showing that the allegedly defamatory statement was made with "actual malice"—that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." The rule is grounded in what the Supreme Court described as the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open ...." *Id.* at 270. Ahrens does not contend that Oetzman was a "public official" within the meaning of *New York Times.* Rather, he argues that the actual malice standard should apply in this case because his letters were written in the context of a "labor dispute" within the meaning of *Linn v. United Plant Guard Workers,* 383 U.S. 53 (1966). We disagree.

Ahrens cites *Linn* for the proposition that defamation actions arising out of labor disputes cannot be prosecuted in the absence of a showing that the statements were made with actual malice *and* that they caused "actual harm" to the plaintiff. First, it is questionable whether *Linn* may be said to stand for the adoption of any rule of substantive law. The issue before the court was whether the National Labor Relations Board had exclusive jurisdiction over allegations of defamation arising in a labor dispute, where the defamation "'would arguably constitute an unfair labor practice'" under federal law. *Id.,* 383 U.S. at 55. Viewed in this context, *Linn's* vitality as precedent is limited to issues of NLRB jurisdiction.

Even if *Linn* may be said to constitute authority for the proposition that the *New York Times* standards apply to defamatory statements made in the context of a labor dispute, we do not believe such a dispute existed in this case. In *Linn,* the allegedly defamatory statement was made in a union election campaign leaflet distributed during a union organizational campaign. The material challenged as defamatory was, in essence, campaign literature, and the court stated that proof of malice and harm should be required in such circumstances in furtherance of the policy of encouraging "wide latitude" in union elections and promoting "free debate on issues dividing labor and management." *Id.,* 383 U.S. at 60, 62 (footnote omitted). The court, quoting *New York Times,* 376 U.S. at 270, acknowledged that considerations of "uninhibited, robust and wide-open" debate, in the context of a union election, "weigh[ed] heavily" in its analysis. *Linn,* 383 at 62, 63.

The facts of this case are dissimilar. Ahrens's conduct had nothing to do with an election, or even with an issue "dividing labor and management." *Linn,* 383 U.S. at 62 (footnote omitted). Nor does Ahrens suggest that, as in *Linn* and *New York Times,* first amendment considerations demand application of the actual malice test. Ahrens's actions did not take place during a union election, a strike or any other form of labor dispute, as that term is commonly understood. There was not even any evidence in the summary judgment proceedings that a grievance had been filed against Oetzman. The letters sent by Ahrens dealt solely with what Ahrens described as Oetzman's "misconduct." We see nothing in the context of this case resembling the type of labor dispute that prompted the *Linn* court to rule as it did.

Ahrens points to the definition of "labor dispute" in the Wisconsin Municipal Employment Relations Act, sec. 111.70(1)(g), Stats., as including "any controversy concerning wages, hours and conditions of employment ...." Because his letters related to "the environment in which the employees worked," he contends that "[t]he controversy over whether the statements [concerning Oetzman's conduct] were made and what should be done ... is a labor dispute," within the meaning of the statute. But what might constitute the type of labor dispute sufficient to invoke the policy considerations discussed in *Linn,* and what might constitute such a dispute for purposes of the Wisconsin Employment Relations Law are two different things. Ahrens does not seek to apply any provision of the Wisconsin act to his activities in this case. He asks no more than that we apply *Linn*—as he reads the case—to these facts. As we have said, while *Linn* may be good precedent on issues concerning the extent of the NLRB's jurisdiction, it is of little value as a guide to substantive law. Even so, the language of the opinion illustrates that, to the extent it may be read as applying the actual malice/actual harm standard to defamatory statements made during a labor dispute, the first amendment and other policy considerations underlying the court's decision are wholly absent here.

Finally, while we agree with the United States Supreme Court's statement in *Meritor Savings Bank v. Vinson,* 477 U.S. 57 (1986), a case cited by Ahrens, that sexual harassment may rise to the level of prohibited "discriminat[ion] ... with respect to [a person's] ... terms, conditions, or privileges of employment" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C., sec. 2000e–2(a)(1), we do

not consider that pronouncement as controlling here. This is a libel, not a discrimination, case.

Ahrens next argues that even if there was no labor dispute within the meaning of *Linn,* the actual malice standard should still be applied in this case because his letters related to sex discrimination in the workplace, which is conduct prohibited by state and federal law. He contends that if employees and their union representatives can be sued for defamation "for reporting perceived sexual harassment," the enforcement of sex discrimination laws will be "seriously eroded," and cites two fifth circuit cases, *Garziano v. E.I. Du Pont De Nemours & Co.,* 818 F.2d 380 (5th Cir. 1987), and *Pettway v. American Cast Iron Pipe Company,* 411 F.2d 998 (5th Cir. 1969), in support of his argument.

We do not see either case as requiring the result Ahrens urges upon us. In *Garziano,* a fired employee sued his employer for libel in connection with a notice posted by the employer indicating that the employee had been terminated for sexually harassing a female coworker. Mississippi law recognizes a qualified privilege for communications discussing the reasons underlying employee firings, and the attorneys in *Garziano* stipulated that once the existence of this privilege is established, "the burden is upon the plaintiff to prove bad faith, actual malice, or abuse of the privilege through excess publication." *Id.,* 818 F.2d at 388. The court upheld the trial court's determination that malice or bad faith had not been proved. But, instead of dismissing the action—as it would be compelled to do if proof of actual malice were essential to maintaining the action—the court remanded the case for a new trial on whether there had been excessive publication of the libelous statement. *Garziano,* in short, did not hold that "actual malice" is a prerequisite to recovery

on libel claims seeking to redress accusations of sexual harassment in the workplace. It was narrowly decided under Mississippi's "qualified privilege" law pursuant to the stipulation of counsel as to the extent of that privilege (i.e., that it is lost upon proof of malice, bad faith or excess publication).

The second case, *Pettway,* was an action by an employee against his employer, and the claim was one for retaliatory firing—that the employee had been fired in retaliation for filing a discrimination complaint. There is no claim of retaliatory firing in this case. While there is dicta in *Pettway* discussing the *Linn* opinion, the court was careful to state that is was *not* deciding that *Linn's* "malice test ... would govern any libel action stemming from an EEOC [Equal Employment Opportunity Commission] proceeding in order to guard against possible abuse of such actions." *Pettway,* 411 F.2d at 1007 n. 22. We note, too, that no sexual harassment charge was ever filed in this case.

We hold, therefore, that the actual malice/actual harm standards of *New York Times, Linn,* and similar cases, are inapplicable here, and that the trial court did not err in denying Ahrens's motion for summary judgment on that issue. As a result, it becomes unnecessary to consider Ahrens's argument that disputed facts exist with respect to whether his letters were motivated by actual malice, or whether Oetzman actually suffered harm as a result of their publication.

Ahrens next contends that the trial court erred in refusing to include a special verdict question asking the jury to determine the truth or falsity of the statements in his letters to the center's director, and in refusing to instruct the jury that it was Oetzman's obligation to prove that the statements were false. The basis for this argument is that the *New York Times*

and *Linn* "standards" should be applied to Oetzman. We have already ruled those cases to be inapplicable.

Ahrens also argues in his reply brief that the trial court's refusal to include a verdict question on the truth of the letters deprived him of a jury determination on that issue and thus "the real controversy was not tried." We assume the argument seeks a discretionary reversal under sec. 752.35, Stats.: "[I]f it appears from the record that the real controversy has not been fully tried ... the court may reverse the judgment or order appealed from ...."

We decline to exercise that discretion. We note first that Ahrens failed to file timely motions after verdict and thus never presented the issue to the trial court. By so doing, he lost the right to raise it on appeal. *Hartford Ins. Co. v. Wales,* 138 Wis. 2d 508, 510–11, 406 N.W.2d 426, 427 (1987). While we may, in our discretion, consider such issues in order to prevent a miscarriage of justice, we see no reason to do so here.

Truth of the allegedly defamatory communication is an affirmative defense in libel actions. *Denny v. Metz,* 106 Wis. 2d 636, 660–61 n. 35, 318 N.W.2d 141, 153, *cert. denied,* 459 U.S. 883 (1982). And affirmative defenses are deemed waived if not raised in the pleadings. *Milwaukee Co. v. Labor & Ind. Rev. Comm.,* 113 Wis. 2d 199, 206, 335 N.W.2d 412, 416 (Ct. App. 1983). Ahrens's answer does not raise truth as an affirmative defense to Oetzman's libel claims. He asserts that because he responded with a general denial to an allegation in the complaint containing language to the effect that the statements in his letters were "untrue when made," he should be considered as having raised the defense of truth. However, we do not consider a general denial to

comply with the requirement that the defense "shall [be] set forth affirmatively" in the pleading. Sec. 802.02(3), Stats.

Finally, Oetzman argues persuasively that the result of the trial would have been the same even if the court had inquired into the truth of the material in the verdict and had given the standard jury instruction on the subject as requested by Ahrens. Under that instruction, the defendant, not the plaintiff, has the burden of proving truth. Wis J I—Civil 2505. Ahrens's first letter stated that Oetzman had "on a number of occasions, approached employees ... with ... requests for sexual favors," yet he never called any of the alleged victims of these contacts as witnesses at trial. Oetzman, of course, denied that he had made sexual advances to anyone, and when he called two of the "prior victims" during his own case, they denied that he had ever made any sexual advances to them. Because Ahrens had the burden of proof as to the truth of the allegations in his concededly defamatory letter that Oetzman had made sexual advances to county employees on "a number of occasions," he could not have carried this burden even if the jury believed that he had sexually harassed L.B. during the interview.

We conclude, therefore, that Ahrens waived the right to have any question of the truth of his assertions included in the special verdict, and we see no reason to relieve him from the effect of that waiver.

*By the Court.*—Judgment and order affirmed.