Robert A. BENKOSKI, Plaintiff-Respondent,

v.

Mark A. FLOOD, Defendant-Appellant,

Kathleen M. FLOOD, Defendant.

Court of Appeals

*No. 00–1250. Submitted on briefs November 22, 2000.—Decided March 7, 2001.*

2001 WI App 84

(Also reported in 626 N.W.2d 851.)

654

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Paul W. Rosenfeldt* of *Edgarton, St. Peter, Petak, Massey & Bullon* of Fond du Lac.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *David Goluba* of Ripon.

Before Brown, P.J., Nettesheim and Snyder, JJ.

¶ 1. NETTESHEIM, J. This case makes its second appearance in the court of appeals. This court previously determined that WIS. STAT. § 710.15 (1999–2000)[1] and WIS. ADMIN. CODE ch. ATCP 125 applied to the contractual relationship between Mark A. Flood, the owner of a mobile home park, and Robert A. Benkoski, the owner of certain mobile homes located in the park. *See Benkoski v. Flood*, 229 Wis. 2d 377, 387–92, 599 N.W.2d 885 (Ct. App. 1999) (*Benkoski I*). We further held that Flood had violated WIS. STAT. § 710.15(4) and WIS. ADMIN. CODE §§ ATCP 125.06 and 125.09 by requiring Benkoski to remove his mobile homes when sold. *Benkoski I*, 229 Wis. 2d at 393. We remanded for a trial to determine Benkoski's damages pursuant to WIS. STAT. § 100.20(5). *Benkoski I*, 229 Wis. 2d at 393.

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version.

¶ 2. Following the bench trial on remand, the trial court awarded pecuniary damages, attorney fees and costs to Benkoski. Flood appeals, raising the following issues: (1) the trial court erroneously applied the ordinary civil burden of proof; (2) under any burden of proof standard, the evidence is insufficient to support the finding that Benkoski had entered into an agreement to sell his mobile home; (3) the trial court erroneously calculated Benkoski's damages; and (4) the trial court erroneously awarded Benkoski attorney fees for his defense of Flood's counterclaim. We reject all of Flood's arguments. We affirm the judgment.

## FACTS

¶ 3. A complete recitation of the underlying facts to this dispute has already been set forth in our prior decision. *See id.* at 380–83. For purposes of this decision, we need only restate that Flood leased lots in his mobile home park to Benkoski, who in turn rented his mobile homes on the lots to third parties. The lease between Flood and Benkoski provided that Benkoski could not sublet the sites unless prior approval had been granted by Flood. Later, Flood imposed an additional condition requiring that any purchaser of a mobile home owned by Benkoski would have to remove the home at the end of the lease. When Benkoski attempted to sell one of the mobile homes, Flood refused to approve the application for tenancy because Benkoski would not agree to the removal condition. *Id.* at 380. As noted, we previously held that Flood's actions violated the administrative code which forbids a mobile home park operator from placing unreasonable restrictions on the sale of a mobile home located in the park. *Id.* at 391–92.

¶ 4. In keeping with our remand, the trial court conducted a trial on damages. The court found that Flood's actions thwarted a potential sale by Benkoski of one of his mobile homes to Kenneth and Linda Longsine for $6500. After invoking the double damages provision of WIS. STAT. § 100.20(5), the court fixed Benkoski's pecuniary loss arising out of the lost sale at $10,240. Following a later hearing on attorney fees, the court awarded Benkoski $51,262.51 in attorney fees and $1329.60 in costs.

¶ 5. Flood moved for reconsideration. He challenged (1) the trial court's application of the ordinary burden of proof in this case versus the middle burden for which he had argued; (2) the trial court's doubling of the lost sale price prior to deducting the fair market value of the mobile home; and (3) the trial court's failure to offset the stream of rental income produced by the mobile home after the lost sale.

¶ 6. Following a hearing, the trial court denied the reconsideration motion. The court held that the supreme court's decision in *Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.*, 190 Wis. 2d 650, 529 N.W.2d 905 (1995), supported its determination that the ordinary civil burden of proof applied to this case. The court further held that doubling of the lost sale price was appropriate in light of similarities between this type of case and Lemon Law and landlord/tenant cases. In addition, the court held that the rental income after the lost sale was not relevant to the issue of Benkoski's pecuniary loss.

## DISCUSSION

¶ 7. While Flood's appellate brief breaks out into many issues and subissues, we see four issues: (1) the proper burden of proof, (2) whether the evidence

showed an agreement between Benkoski and the Long-sines for the sale of the mobile home, (3) the proper calculation of damages, and (4) the proper award of attorney fees.

¶ 8. We begin with a discussion of our standards of review. The determination of the appropriate burden of proof required by WIS. STAT. § 100.20(5) presents a question of statutory interpretation. *Carlson*, 190 Wis. 2d at 658. The same standard applies to Flood's challenge to the trial court's calculation of damages since that argument rests on the meaning of "pecuniary loss" as that term is used in the statute.[2] We interpret the statute independent of the trial court's interpretation. *Id*. Nonetheless, we benefit from the analysis performed by the trial court. *Id*. "The principal objective of statutory interpretation is to ascertain and give effect to the intent of the legislature." *Id*. We ascertain that

---

[2] The relevant paragraphs of WIS. STAT. § 100.20 read as follows:

**100.20 Methods of competition and trade practices. (1)** Methods of competition in business and trade practices in business shall be fair. Unfair methods of competition in business and unfair trade practices in business are hereby prohibited.

. . . .

(2)(a) The department, after public hearing, may issue general orders forbidding methods of competition in business or trade practices in business which are determined by the department to be unfair. The department, after public hearing, may issue general orders prescribing methods of competition in business or trade practices in business which are determined by the department to be fair.

. . . .

(5) Any person suffering pecuniary loss because of a violation by any other person of any order issued under this section may sue for damages therefor in any court of competent jurisdiction and shall recover twice the amount of such pecuniary loss, together with costs, including a reasonable attorney's fee.

intent by examining the language of the statute and the scope, history, context, subject matter and purpose of the statute. *Hughes v. Chrysler Motors Corp.*, 197 Wis. 2d 973, 978, 542 N.W.2d 148 (1996). We are also aware that remedial statutes should be liberally construed to suppress the mischief and advance the remedy that the statute intended to afford. *Id.*

¶ 9. Flood's challenge to the trial court's finding that Benkoski and the Longsines reached an agreement for the sale of the mobile home requires that we apply the clearly erroneous standard of review. *See* WIS. STAT. § 805.17(2).

¶ 10. Finally, appellate review of an award of attorney fees is limited to whether the trial court properly exercised its discretion. *Hughes*, 197 Wis. 2d at 987. Such discretion is properly exercised if the court "employs a logical rationale based on the appropriate legal principles and facts of record." *Id.* (citation omitted).

### *1. Burden of Proof*

¶ 11. Flood contends that the appropriate burden of proof to apply in calculating damages under WIS. STAT. § 100.20(5) is the middle burden—the clear and convincing evidence standard. *See* WIS JI—CIVIL 205. Benkoski, on the other hand, argues that the trial court was correct in applying the ordinary civil burden—the reasonable certainty by the greater weight of the credible evidence standard. *See* WIS JI—CIVIL 200.

¶ 12. Flood offers two arguments in support of the middle burden of proof. First, he argues that his conduct is subject to criminal penalties and, as such, *State v. Fonk's Mobile Home Park and Sales, Inc.*, 133

Wis. 2d 287, 395 N.W.2d 786 (Ct. App. 1986), holds that the middle burden of proof applies.

¶ 13. We disagree that *Fonk's* controls this issue. There, the State brought a civil action against a mobile home park operator for violating WIS. ADMIN. CODE § AT CP 125.07 by unreasonably restricting its tenants' resale of mobile homes. *See Fonk's,* 133 Wis. 2d at 290–91. The trial court found that Fonk's had violated the administrative code and issued an injunction. *See id.* at 291. One of the issues on appeal was whether the State had satisfied its burden of proof. Both the State and Fonk's agreed that the middle burden of proof applied because the conduct involved was subject to criminal penalties. We also agreed. *Id.* at 301 & n.7.

¶ 14. However, in *Carlson,* our supreme court distanced itself from our burden of proof statement in *Fonk's.* The *Carlson* court stated, "The question of the appropriate standard of proof was not, however, at issue in *Fonk's*; the parties in *Fonk's* had agreed that the middle burden applied." *Carlson,* 190 Wis. 2d at 659 n.7. Thus, *Carlson* observed that there were no published Wisconsin cases that addressed the applicability of the middle burden of proof to a private, civil cause of action. *Id.* at 658 n.7. *Carlson* went on to hold that the ordinary burden of proof applies to cases under WIS. STAT. ch. 133—the "Little Sherman" Antitrust Act—notwithstanding its provision for treble damages and possible criminal penalties. *See Carlson,* 190 Wis. 2d at 667–68.

¶ 15. Although *Carlson* was an antitrust case and this is an unfair trade practices case, we conclude that *Carlson* represents the appropriate framework for our burden of proof analysis. In deciding that the ordinary burden of proof applied, the *Carlson* court noted the remedial aspects of the antitrust law. The court

held that application of the lower burden advanced the legislative purpose of the Wisconsin antitrust law and comported with the Wisconsin tradition of adhering to interpretations of the federal antitrust law on which our state antitrust law is based.[3] *Id.* at 662. The court noted that the purpose of the antitrust statute was to prevent restraint of free competition that harms the public, to prevent monopolies, and to generally encourage free competition. *Id.* Toward that end, the legislature determined that private, civil suits are an important method of enforcing the antitrust statute because it was filled with incentives for private litigants: tolling of the statute of limitations, as well as the awarding of costs and attorney fees. *Id.* at 663. With such incentives in place, private parties serve as "private attorney generals" that supplement the limited resources of the state in enforcing the law. *Id.* at 663–64.

¶ 16. WISCONSIN STAT. § 100.20 is similarly remedial. The statute addresses methods of competition and trade practices. Subsection (5), which provides for double damages together with attorney fees and costs, supplies the teeth to the unfair trade practice regulations promulgated under subsec. (2) of the statute. WISCONSIN ADMIN. CODE ch. ATCP 125, which governs mobile home parks, was created pursuant to this authority. In our earlier decision, we held that Flood's policy mandating the removal of Benkoski's mobile

---

[3] One of Flood's arguments for distinguishing *Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.*, 190 Wis. 2d 650, 529 N.W.2d 905 (1995), is that we owe no deference to federal antitrust law in this case because this is not an antitrust case. While this is true, we believe that the core idea from *Carlson* is that we apply the ordinary burden of proof when it advances the legislature's purpose in enacting a law.

homes upon resale violated §§ ATCP 125.06 and 125.09. *See Benkoski I*, 229 Wis. 2d at 393. This violation of ch. ATCP 125 entitled Benkoski to damages under § 100.20(5).

¶ 17. The purposes and policies underlying WIS. STAT. § 100.20(5) are very much like those underlying the Wisconsin antitrust law as discussed in *Carlson*. In *Shands v. Castrovinci*, 115 Wis. 2d 352, 340 N.W.2d 506 (1983), our supreme court laid out these policies. First, the awarding of double damages and attorney fees encourages those injured by unfair trade practices in violation of the administrative regulations to bring forward their causes of action. *Id.* at 358. Second, the statutory remedies encourage individuals to act as "private attorney generals" in enforcing their rights, with the aggregate effect of these individual actions operating to enforce the public's rights. *Id.* Third, the statutory remedies deter impermissible conduct that violates administrative regulations because they subject the violator to double damages, attorney fees and costs. *Id.* Fourth, private actions augment enforcement of the administrative regulations by the department of justice, which has insufficient resources to prosecute all violations. *Id.* at 358–59. The application of the ordinary civil burden of proof fosters these policies.

¶ 18. As his second argument in support of the middle burden of proof, Flood relies on the law of punitive damages, likening those damages to the multiple damages authorized by WIS. STAT. § 100.20(5). Flood argues, "[T]here is indeed a long line of Wisconsin cases which strongly suggest that the middle burden of proof is to be applied in multiple damages cases regardless of whether conduct that is subject to criminal penalties is

involved." Flood claims that *Carlson* recognizes as much. We disagree. In fact, *Carlson* is to the contrary because it explicitly recognizes that there are important distinctions between common law punitive damages—which traditionally call for the higher, middle burden of proof, *see Carlson,* 190 Wis. 2d at 659—and statutory multiple damages. *Id.* at 660 n.9. Thus, Flood's reliance on the punitive damages cases is misplaced. We agree with the trial court that the ordinary burden of proof is the proper standard to apply as it best advances the remedial purposes of the statute.

## 2. *Sufficiency of the Evidence*

¶ 19. Next, Flood argues that Benkoski failed to meet the burden of proof under any standard. Specifically, Flood argues that the evidence does not establish an agreement between Benkoski and the Longsines for the sale of Benkoski's mobile home. On this point, each party is able to point to certain evidence supporting their competing positions. This necessitated that the trial court engage in fact-finding. As such, we will affirm the trial court's findings unless clearly erroneous. *See* Wis. Stat. § 805.17(2).

¶ 20. The key pieces of evidence on this issue are the various documents memorializing the agreement between Benkoski and the Longsines and the testimony of Linda Longsine. At trial, Benkoski submitted a copy of the application for tenancy signed by him and the Longsines, which was submitted to Flood for his approval. In addition to personal information about the prospective tenants, the document lists an agreed upon sale price of $6500 for the mobile home, which was to be financed by Benkoski. The record also contains copies of two receipts issued by Benkoski to the Longsines.

The first one is in the amount of $50 and indicates that the payment was a partial down payment on the purchase of the mobile home. The second one is for $950 and indicates that the payment was in part for rent, in part a security deposit and in part for a credit report, with the balance to be applied toward the purchase price. A cover letter was also submitted to Flood with the application for tenancy that states that the Longsines were purchasing the mobile home in question, and that they were "interested in completing this deal as soon as they receive confirmation from [Flood]." Flood's response was to reject the Longsines' application for tenancy and reiterate his policy that Benkoski's mobile homes would have to be removed from his park upon their next sale.

¶ 21. The nature of the agreement between the Longsines and Benkoski became a little more uncertain following Linda Longsine's testimony at trial. Flood argues that in order for Benkoski to satisfy his burden of proof, he had to show that "but for the Floods' refusal to process the Longsines' Application for Tenancy, the Longsines would have purchased the mobile home." Flood believes that Linda's testimony concerning "her readiness and willingness to purchase the mobile home was equivocal at best." Flood supports this with portions of Linda's testimony on cross-examination where she said that Benkoski offered several occupancy options and that she chose the "rent-to-own" option. However, she also said that she did not think this arrangement obligated her to purchase the mobile home. Flood further cites to portions of Linda's testimony stating that she and her family continued to rent Benkoski's mobile home for a period of nine months, but moved out to purchase a different mobile home

because Benkoski was slow to respond to complaints about the home and it was too small for her family.

¶ 22. The trial court also questioned Linda about her understanding of the agreement, which elicited the following testimony:

> Q In your mind, on the 3rd of January of '95 when you signed the [application for tenancy], did you have an understanding of what you would have been purchasing and for how much
>
> A Yes.
>
> Q —if anything? What?
>
> A We would have been purchasing—we would have purchased this mobile home for the price that he has, $6,500.
>
> Q And what was that contingent upon, if anything?
>
> A Can you rephrase that?
>
> Q Okay. You were going to do that if what happened?
>
> A If he could get Flood to approve us, but Flood had told us—or had said that we would have to move the mobile home out.

■■

¶ 23. Ultimately, the trial court concluded that an agreement to purchase the mobile home existed, that the agreement was subject to Flood's approval of the application for tenancy, and that but for Flood's denial of the application, the Longsines would have purchased Benkoski's mobile home for $6500. The court also viewed the money paid by the Longsines to Benkoski as part performance on the deal. It is for these reasons that the court believed the Longsines

were "ready, willing and able buyer[s] to purchase the home at that time . . . prior to Flood's . . . refusal to accept the application." While it is true that the Longsines later changed their minds about purchasing the mobile home because they became unhappy with the size and condition of the home, the evidence supports the trial court's implicit determination that had Flood approved the application for tenancy, the deal would have closed. The trial court's finding that Benkoski and the Longsines reached an agreement for the sale of the mobile home was not clearly erroneous.

### 3. Calculation of Damages

¶ 24. Flood challenges the trial court's calculation of damages. Flood's first argument focuses on the meaning of "pecuniary loss" as used in WIS. STAT. § 100.20(5), and how that term bears upon the methodology intended by the legislature in calculating damages under that section. As stated earlier, this issue presents a question of statutory interpretation that we review de novo.

¶ 25. Flood argues that the trial court erred in doubling Benkoski's loss from the lost mobile home sale prior to subtracting the fair market value of the mobile home. Borrowing from Lemon Law and landlord/tenant law, the court determined that Benkoski's initial damages were $6500 for the purchase price he was to receive and $120 in advertising costs. The court then doubled that amount to $13,240. Thereafter, the court deducted the fair market value of the mobile home—$3000—to produce a net recovery to Benkoski of $10,240.

¶ 26. Flood contends that the trial court should have subtracted the fair market value of the mobile

home from the sum of the purchase price and advertising expenses prior to applying the damage multiplier in WIS. STAT. § 100.20(5). Instead of the trial court's analogy to Lemon Law and landlord/tenant law, Flood argues for a contract law "benefit-of-the-bargain" approach.[4]

¶ 27. But the supreme court rejected an argument similar to Flood's in *Hughes*, a Lemon Law case. There, Chrysler argued that pecuniary loss should be limited to out-of-pocket expenses rather than the full purchase price of the car. *See Hughes*, 197 Wis. 2d at 978. Instead, the supreme court concluded that the legislature intended to include the purchase price in pecuniary damages under the Lemon Law. *Id.* at 982. The court based its holding on the following factors: (1) it would provide consumers with remedies that are meaningfully better than those afforded by statute prior to enactment of the Lemon Law; (2) doubling the purchase price as damages would provide more incentive for manufacturers to resolve disputes more quickly, without litigation; and (3) recovery would be large enough to give vehicle owners incentive to bring suit. *Id.* at 983.

¶ 28. The court of appeals has also rejected a similar argument in *Moonlight v. Boyce*, 125 Wis. 2d 298, 372 N.W.2d 479 (Ct. App. 1985). *Moonlight* is particularly instructive because it involves landlord/tenant regulations with violations subject to the penalties set out in WIS. STAT. § 100.20(5)—the same remedies

---

[4] In support, Flood cites to the comment that follows WIS JI—CIVIL 2780, which is entitled "Intentional Interference With Contractual Relationship." The comment cites to section 774A of the RESTATEMENT (SECOND) OF TORTS saying that "[d]amages may include . . . pecuniary loss of benefits of the contract." WIS JI—CIVIL 2780.

afforded in this case. In *Moonlight*, the landlord argued
that there were no pecuniary damages arising out of
the tenant's improperly withheld security deposit
because the landlord's counterclaim award for damage
to the property exceeded the amount of the security
deposit. *See Moonlight*, 125 Wis. 2d at 303. This court
concluded, however, that once an administrative code
violation was found, the tenant suffers a pecuniary loss
under § 100.20(5) in the amount of the security deposit,
regardless of the amount of damages the landlord may
recover on a counterclaim. *Moonlight*, 125 Wis. 2d at
305–06. We based this holding on the purposes of the
administrative code provisions, § 100.20(5) and the pol-
icy interests discussed in *Shands*. *See Moonlight*, 125
Wis. 2d at 306. As such, we held that the tenant was
entitled to the remedies of § 100.20(5), including
double the amount of the pecuniary loss. *Moonlight*,
125 Wis. 2d at 306.

¶ 29. Moreover, Flood's proposed methodology
would create a scenario counter to that envisioned by
the legislature when it created this remedial statute.
As Benkoski points out, in the average case, an injured
party would rarely be able to negotiate a price greater
than market value for his or her property. In such a
case, an injured party would be remediless because he
or she would still have his or her property—thus zero-
ing out the amount of pecuniary loss prior to applying
the damage multiplier. Flood's approach does not pro-
mote the purposes and objectives that lie behind the
legislature's creation of the damage multiplier provi-
sion in WIS. STAT. § 100.20(5). Thus, we agree with the
trial court's method of calculating damages because it
furthers the statutory objectives behind § 100.20(5).
We hold that the trial court properly doubled

Benkoski's lost sale price and advertising expense prior to subtracting the fair market value of the mobile home that Benkoski retained.

¶ 30. Flood's final argument regarding calculation of damages is that the evidence does not support *any* claim for damages because Benkoski continued to derive financial benefit from the stream of rental income that the mobile home produced after the lost sale. Flood develops this argument by piecing together Benkoski's rents and expenses, and comparing them to what Benkoski would have made through the sale of the mobile home. But Flood offers no authority for this novel method of calculating pecuniary loss under WIS. STAT. § 100.20(5). Instead, we agree with the trial court's analysis:

> [Benkoski] attempted to sell the mobile home . . . he had an offer and it was frustrated, so, therefore, I felt that was the truest measure of damages at that snapshot in time as to say when . . . the violation of law occurred according to the Court of Appeals. He attempted to sell a mobile home and he couldn't and that was the best measure of what his loss was at that particular time. What might have happened in the future, I think, would be speculation on my part from either the income approach or from any other approach of how he might have invested that money from the sale of the mobile home.[5]

---

[5] The trial court also addressed the stream of income argument as well. The court found that even if it employed the stream of income approach advanced by Flood, the amount of profit through renting the mobile home would have been very small after offsetting the expenses required to maintain the property. This was prior to considering labor that Benkoski supplied for repairs and improvements or assessment of his customary management fee.

¶ 31. Harkening back to our repeated emphasis on the statutory objectives behind WIS. STAT. § 100.20(5), we hold that the trial court's answer to this argument was the proper one. Adoption of Flood's proposal would only serve to penalize mobile home owners who are able to turn a profit through rental activities despite a park owner's violation of the statutes and administrative regulations. Such a result would not further the statutory objectives we have recited.

¶ 32. Although this is not a contract case, we find additional support for our holding in the law of contracts. Flood's unfair trade practices thwarting Benkoski's potential sale caused damages akin to those caused by a breach of contract. WISCONSIN JI—CIVIL 3735, entitled "Damages: Loss of Expectation" states,

> [t]he measure of damages for a breach of contract is the amount which will compensate the plaintiff for the loss suffered because of the breach. A party who is injured should, as far as it is possible to do by monetary award, be placed in the position in which he or she would have been had the contract been performed.

We conclude that the "pecuniary loss" concept set out in WIS. STAT. § 100.20(5) is similar to this concept of damages set out in the law of contracts. We hold that the trial court was correct in limiting its consideration of damages to those existing at the time of the rejected application for tenancy.

### 4. Attorney Fees

¶ 33. Flood argues that the trial court erred in awarding Benkoski attorney fees incurred in defense of his counterclaim. As stated earlier, our review of this

question is limited to whether the circuit court properly exercised its discretion. *Hughes*, 197 Wis. 2d at 987. Flood bases his argument upon this court's decision in *Paulik v. Coombs*, 120 Wis. 2d 431, 355 N.W.2d 357 (Ct. App. 1984), which the trial court found inapposite. Flood contends that the trial court erroneously distinguished *Paulik*.

¶ 34. *Paulik* involved a landlord/tenant dispute where the landlord was guilty of violations of the administrative code, but was successful on a counterclaim producing damages that exceeded the tenants' statutory damages under WIS. STAT. § 100.20(5). *See Paulik*, 120 Wis. 2d at 435. In keeping with § 100.20(5), we held that the tenants were entitled to double damages and reasonable attorney fees even though they were unsuccessful in defending against the landlord's counterclaim. *Paulik*, 120 Wis. 2d at 438. We remanded the matter to the trial court for a determination of the tenants' reasonable attorney fees. *Id.* at 438–39. We held that "[t]he determination of attorneys fees under sec. 110.20(5), Stats., however, should not include those incurred in defending against Coombs' counterclaim." *Paulik*, 120 Wis. 2d at 439 n.5. Flood seizes on this language in support of his argument that Benkoski's attorney fees award should not have included fees expended in defending on Flood's counterclaim.

¶ 35. Flood places too general a reading on *Paulik*. There, the tenant's claim was based on the landlord's failure to provide the requisite written statement accounting for the retention of a security deposit. *Id.* at 434 n.3. None of those facts was *directly* related to the landlord's counterclaim for rents and damages. In our case, however, Flood's counterclaim was premised on Benkoski's alleged failure to remove the

mobile home units when they became vacant. This, of course, was also the very crux of Benkoski's claims that Flood had committed an unfair trade practice under WIS. STAT. § 710.15(3)(b) and (4) and WIS. ADMIN. CODE § ATCP 125.06(1)(a). *See Benkoski I*, 229 Wis. 2d at 381. As such, these competing claims were inextricably caught up with each other.

¶ 36. In its thorough and well-reasoned decision, the trial court made the same observation:

> In order for the plaintiff to prosecute this claim effectively and prevail on his own original complaint, he needed to defeat both the seventh affirmative defense as well as the defendant's counterclaim. Both claims were inextricably intertwined with the prosecution of the plaintiff's claim and for those reasons I will deny no attorney's fees to the plaintiff for defense of the counterclaim.

¶ 37. We conclude that the trial court did not erroneously exercise its discretion in awarding Benkoski his attorney fees incurred in defense of Flood's counterclaim.

¶ 38. As a final matter, we address Benkoski's request for attorney fees incurred on appeal. This question was answered by our supreme court in *Shands* when it held that a plaintiff who recovers attorney fees at the trial court level shall recover further attorney fees incurred on a successful defense of the award on appeal. *See Shands*, 115 Wis. 2d at 359. Therefore, we hold that Benkoski is entitled to his appellate attorney fees and remand this case to the trial court for such a determination.

## CONCLUSION

¶ 39. We hold that the ordinary, civil burden of proof applies to actions for damages occasioned by violations of WIS. ADMIN. CODE ch. ATCP 125 and that the trial court was not clearly erroneous in concluding that Benkoski had satisfied this burden. We hold that the trial court properly doubled Benkoski's pecuniary losses prior to offsetting this amount by the fair market value of the mobile home still in his possession. We hold that the evidence supports the damage award. We hold that the trial court properly exercised its discretion in awarding Benkoski attorney fees incurred in defense of Flood's counterclaim because the claims were inextricably intertwined. Finally, we hold that Benkoski is entitled to his attorney fees incurred on this appeal and we remand to the trial court for a determination on that matter.

*By the Court.*—Judgment affirmed and cause remanded with directions.