Bruce G. FELLAND and Nordic Financial Corporation, Plaintiffs-Respondents-Cross-Appellants,

v.

William R. SAUEY, Defendant,

COLUMBIA PARCAR CORP., Flambeau Corporation, Nordic Group of Companies, Ltd., Pacjets Financial, Ltd., and Seats Incorporated, Defendants-Appellants-Cross-Respondents.

Court of Appeals

*No. 00–2102. Submitted on briefs May 4, 2001.—Decided October 18, 2001.*

2001 WI App 257

(Also reported in 637 N.W.2d 403.)

On behalf of the defendant-appellants-cross-respondents, the cause was submitted on the briefs of *Roy L. Prange, Jr., Anthony A. Tomaselli, Kristin Graham Noel* of *Quarles & Brady LLP*, Madison.

On behalf of the plaintiffs-respondents-cross-appellants, the cause was submitted on the briefs of *Stephen A. DiTullio* and *Mark R. Sewell* of *DeWitt Ross & Stevens, S.C.*, Madison.

Before Dykman, Deininger and Lundsten, JJ.

¶ 1. DYKMAN, J.  Five companies owned by William Sauey (collectively "Nordic Group") appeal from the portion of a judgment awarding Bruce Felland and Nordic Financial Corporation (collectively "Felland") $62,500 plus prejudgment interest for breach of contract. Felland cross-appeals from the portion of the judgment dismissing William Sauey from the case because Felland had failed to prove at trial that Sauey was acting on behalf of himself in addition to his companies. Nordic Group argues that its agreement with Felland is unenforceable because Felland failed to put the agreement in writing as required by Wis. Stat. § 440.77 (1989–90)[1] and Wis. Admin. Code § RL 44.03 (December 1991). Nordic Group further argues that Felland failed to comply with the terms of the agreement, even if it is enforceable. On cross-appeal, Felland asserts that Sauey waived an agency defense because he failed to raise the issue in his answer or at trial.

¶ 2.  We conclude that a failure to comply with Wis. Stat. § 440.77 and Wis. Admin. Code § RL 43.04 does not invalidate an otherwise valid agreement made by a loan solicitor and that Felland complied with the terms of his agreement with Sauey and Nordic Group such that he is entitled to his commission. Further,

---

[1] All references to the Wisconsin Statutes are to the 1989–90 version unless otherwise noted.

Sauey waived a defense of agency when he failed to raise it until after the trial. We therefore affirm in part and reverse in part.

## I. Background

¶ 3.   In March 1992 William Sauey contacted Bruce Felland, a loan solicitor, to assist in obtaining funding for three companies in which Sauey had an ownership interest: Pacjets Financial Ltd., Columbia Parcar Corp., and Snow Valley, Inc. In addition, Sauey wanted Felland to find financing for a building in Deerfield, Wisconsin. Sauey verbally agreed to pay a .5% brokerage fee for a loan commitment originated by Felland and accepted by Sauey for Columbia ParCar, Pacjets, Snow Valley, and the Deerfield real estate. In a letter to Sauey dated March 18, 1992, Felland confirmed their agreement:

> This is to confirm our recent conversation regarding my fees relative to the above referenced subject ["Financing Services"]. I have agreed to charge you, or your related corporate entities, a fee equal to fifty basis points (1/2%) of any loan commitment which is originated by me and accepted by you.
>
> This fee is earned at the time of acceptance, but I generally wait for payment until the time for funding. In most cases I have a contract signed by the borrower, but that won't be necessary with you.
>
> I have already made a request to John Weber for certain financial information on PACJETS Financial, Ltd., and have enclosed a copy of same for your information. Also, I intend to call Benno Nager and request that he send the updated information on Snow Valley directly to me.

I am looking forward to the prospect of successfully placing some funding requests on your behalf, and want to thank you for the opportunity.

¶ 4. Due to the three companies' financial troubles, Felland had difficulty finding financing. In early April 1992, Felland had identified no lending institutions interested in providing loans. After a conversation with Sauey, Felland expanded his efforts. Specifically, Felland began seeking financing for a "consolidated group of companies," which would be comprised of both companies from the original group and a number of financially stronger companies that Sauey also owned, in the hope that this would generate interest from banks.

¶ 5. At the end of April, Felland wrote to Sauey again to inform him of the progress he was making in finding a lender for Sauey's "consolidated group of companies." Felland wrote that there were two institutions potentially interested in establishing a lead bank relationship, Bank One and Yatsuda Trust & Banking Co., Ltd. Sauey responded by thanking Felland for his efforts, and stating that he was looking forward to hearing more about Yatsuda Trust. However, Sauey wrote that he would not be contacting Bank One because he was already working with them.

¶ 6. In May Felland wrote that he had spoken with David Grams, who was the loan officer for LaSalle National Bank. He also wrote that Grams was "very interested in finding out more about your companies and their banking needs." Felland gave Sauey Grams' telephone number, explaining "that it would be prudent to have you contact him directly rather than attempting to set up a meeting through me."

¶ 7. After almost a year of negotiations, Nordic Group entered into a $12.5 million credit agreement

with LaSalle National Bank on April 15, 1993. Flambeau Corp., Flambeau Plastics Corp., Seats Inc., Artecon Inc., and Pacjets Financial Ltd., were each party to the agreement. In addition, there was a provision in the agreement that allowed intercompany loans to be made to Columbia Parcar.

¶ 8.   Upon learning of the agreement from Grams, Felland wrote to Sauey, requesting that he be paid his fee for originating the loan commitment. When Sauey refused, Felland sued Sauey and each of the companies named in the credit agreement, claiming breach of contract.

¶ 9.   At trial Felland testified that he told Sauey in early April that finding financing for Pacjets, Columbia Parcar, and Snow Valley was unlikely and that Sauey would need to either consolidate his companies or "do a funding to one of his other stronger entities which in turn could then loan the money back to the weak ones." According to Felland, Sauey told him that he was already in the midst of creating a consolidation plan, and agreed to allow Felland to seek funding for a consolidated group. Sauey denied having told Felland that he could seek financing for anything but the original four entities. In an oral decision, the circuit court ruled in favor of Felland, finding that Sauey had authorized Felland to seek financing for a consolidated group and concluding that Felland had complied with the terms of their agreement such that he was entitled to his commission.

¶ 10.   After the circuit court ruled in favor of Felland but before entry of judgment, Sauey filed a motion with the court requesting that he be dismissed from the suit because "the evidence produced at trial clearly established that Mr. Sauey was not acting in his individual capacity but rather on behalf of his compa-

nies." The court responded in a letter dated June 21, 2000, stating: "I have reviewed the file and would agree that there was no testimony specifically during the trial that Mr. Sauey acted other than on behalf of his companies." On the same day, the court entered judgment in favor of Felland against all defendants save for Sauey, who was dismissed from the action.

¶ 11. Nordic Group appeals from the part of the judgment ordering that Felland recover $62,500 plus prejudgment interest from the five companies. Felland cross-appeals the part of the judgment dismissing Sauey from the case.

## II. Analysis

### A. Requirements of WIS. STAT. § 440.77

¶ 12. Nordic Group does not contest that it had an agreement with Felland. Rather, it argues that Felland failed to put the agreement they had in writing and that it is therefore unenforceable. For support, Nordic Group relies on WIS. STAT. § 440.77(1)(i) and (k) and WIS. ADMIN. CODE § RL 43.04(5).[2] WISCONSIN STAT. § 440.77 provides in part:

> **440.77 Discipline of mortgage brokers, loan originators and loan solicitors. (1)** PROHIBITED CONDUCT. The department may revoke, suspend or limit the certificate of registration of a mortgage banker, loan originator or loan solicitor, or reprimand a mortgage banker, loan originator or loan solicitor, if it finds that the mortgage banker, loan originator or loan solicitor did any of the following:

---

[2] WISCONSIN STAT. § 440.77 was renumbered as WIS. STAT. § 224.77 in 1995. *See* 1995 Wis. Act 27 §§ 6598–6600. WIS. ADMIN. CODE § RL 43.04 was renumbered as WIS. ADMIN. CODE § DFI-Bkg 43.04 in June 1999.

. . . .

(i) Demonstrated a lack of competency to act as a mortgage banker, loan originator or loan solicitor in a way which safeguards the interests of the public.

. . . .

(k) Violated any provision of this subchapter, ch. 138 or any federal or state statute rule or regulation which relates to practice as a mortgage banker, loan originator or loan solicitor.

WISCONSIN ADMIN. CODE § RL 43.04 provides in part:

**RL 43.04 Incompetency to act as a mortgage banker, loan originator or loan solicitor.** The following conduct, without limitation because of enumeration, demonstrates a lack of competency to act as a mortgage banker, loan originator, or loan solicitor in a way which safeguards the interest of the public prohibited by s. 440.77(1)(i), Stats.:

. . . .

(5) Failing to ensure that all agreements, disclosures, representations and promises to perform services under ch. 440, subch. VI, Stats., are in writing.

Because failure to put an agreement in writing demonstrates a lack of competency under WIS. ADMIN. CODE § RL 43.04(5), and acting in a way that demonstrates a lack of competency is prohibited by WIS. STAT. § 440.77(1)(i), Nordic Group contends that the agreement between it and Felland is unenforceable.

¶ 13. The circuit court rejected this argument, concluding that the March 18 letter from Felland to Sauey constituted a written "promise to perform," which was sufficient to meet the requirements of the statute. We need not decide, however, whether the

971

March 18 letter satisfied the requirements of WIS. STAT. § 440.77 and WIS. ADMIN. CODE § 43.04 because we conclude that, even if Felland failed to comply with those requirements, his failure does not merit voiding the contract. *See Vanstone v. Town of Delafield*, 191 Wis. 2d 586, 595, 530 N.W.2d 16 (Ct. App. 1995) (holding that the court of appeals may affirm a decision on grounds not relied upon by the circuit court).

¶ 14.   As Nordic Group points out, the general rule in Wisconsin is that contracts made in violation of a statute will not be enforced. *See Perma-Stone Corp. v. Merkel*, 255 Wis. 565, 570–71, 39 N.W.2d 730 (1949). However, not all contracts made in violation of a statute are void. *Vic Hansen & Sons, Inc. v. Crowley*, 57 Wis. 2d 106, 116, 203 N.W.2d 728 (1973). We look to the intent of the legislature in enacting the statute to ascertain whether a violation makes the agreement unenforceable. *Id.* at 117. *See also Posnanski v. Hood*, 46 Wis. 2d 172, 181, 174 N.W.2d 528 (1970) ("[T]he courts will always look to the language of the statute, the subject matter of it, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment.") (Internal quotations omitted.)

¶ 15.   Further, as the supreme court noted in *Brooks v. Steffes*, 95 Wis. 2d 490, 290 N.W.2d 697 (1980), "There are many varieties and degrees of 'illegality' and these varieties and degrees must be taken into account in determining the juristic effect of a transaction that involves some form of illegality." *Id.* at 513 n.18 (quoting 6A CORBIN, CONTRACTS, § 1534, at 816 (1962)). The *Steffes* court also noted that an agreement should be declared unenforceable on the grounds of illegality:

"only after a careful balancing, in the light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms. . . . Only if the factors that argue against enforcement clearly outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enactment, and any public interest in the enforcement of the particular term will enforcement be denied."

*Id.* at 514 n.18 (quoting RESTATEMENT (Second) of Contracts, § 320 Comment b, Tentative Draft No. 12 (March 1, 1977)).

■

¶ 16. WISCONSIN STAT. § 440.77 does not invalidate non-written agreements made by a loan solicitor. Rather, the statute is a disciplinary provision, authorizing the division of banking to revoke or suspend the license of a broker or solicitor for various acts of misconduct, including demonstrating a lack of competency. Nowhere does the statute suggest that those contracting with loan solicitors may obtain the benefit of their bargain and then refuse to pay for the services rendered because the agreement was not put in writing. Had the legislature wished to enact a statute of frauds for agreements made by loan brokers, it could have done so. *Cf. Chapman v. Zakzaska*, 273 Wis. 64, 68, 76 N.W.2d 537 (1956) ("It would seem that if the legislature had intended to extend or enlarge [the] consequences [of violating WIS. STAT. § 218.01(7a)(a)] by enlarging the remedies long and exclusively afforded to the buyer in a case of breach of warranty or of a fraudulent misrepresentation it would have so declared.")[3]

---

[3] Even a statute of frauds applying to agreements made by loan solicitors would not necessarily bar a party in Felland's

¶ 17. We are therefore unpersuaded that the purpose of WIS. STAT. § 440.77 was to allow those contracting with loan brokers to avoid fulfilling their contractual obligations by providing them with "a technical escape from a fair and definite agreement." *US Oil Co., Inc. v. Midwest Auto Care Servs., Inc.*, 150 Wis. 2d 80, 90, 440 N.W.2d 825 (Ct. App. 1989). Further, Nordic Group has not shown that "the factors that argue against enforcement clearly outweigh the law's traditional interest in protecting the expectations of the parties."[4] The legislature intended to authorize the division of banking to discipline loan solicitors who fail to meet professional standards, not to void otherwise valid agreements. The division of banking could have decided to discipline Felland if it believed that he was not acting in accordance with WIS. STAT. § 440.77. Regardless, we decline to enact a statute of frauds for agreements with loan solicitors by judicial fiat.

position from obtaining relief. Plaintiffs who have failed to comply with the statute of frauds requirements may still make a claim for unjust enrichment when the plaintiff has conferred a benefit upon the defendant, the defendant appreciates or knows of the benefit, and retention of the benefit without payment would be inequitable. *Halverson v. River Falls Youth Hockey Assoc.*, 226 Wis. 2d 105, 115, 593 N.W.2d 895 (Ct. App. 1999). This is further evidence that the legislature did not intend to render unenforceable non-written agreements made by loan solicitors.

[4] We also note that invalidating Sauey's and Felland's agreement because it was not in writing would be particularly inequitable since Felland chose not to require Sauey to sign a contract as a token of his trust in Sauey.

*B. Terms of the Agreement*

¶ 18. In addition to challenging the agreement under Wis. Stat. § 440.77 and Wis. Admin. Code § RL 43.04, Nordic Group also contends that the circuit court's decision should be reversed because Felland did not comply with the terms of the agreement. First, Nordic Group argues that Felland never "originated a loan commitment" as he promised in his March 18 letter. Instead, it contends, Felland, at most, "originated a relationship" with LaSalle National Bank. We review a circuit court's determination regarding the meaning of a word in a document de novo. *See Levy v. Levy*, 130 Wis. 2d 523, 528–29, 388 N.W.2d 170 (1986).

¶ 19. We conclude that Felland fulfilled his promise to originate a loan commitment. It was through Felland's efforts that Nordic Group was able to enter into a credit agreement with LaSalle. Nordic Group does not dispute that it was Felland who identified LaSalle as a possible source of financing, that Felland contacted LaSalle's loan officer, David Grams, on behalf of Sauey and Nordic Group, and that Felland used this conversation to generate interest in Sauey's companies. Moreover, it was in response to Felland's call that Grams first contacted Sauey to discuss a possible financing arrangement. Sauey admitted that he had no banking relationship with LaSalle prior to Grams calling him in May 1992. Ultimately, Nordic Group entered into a $12.5 million credit agreement with LaSalle.

¶ 20. It is true that, after making the initial contact, Felland did not play a sizeable role in the negotiation process. However, Felland testified, and the circuit court believed, that he chose not to assert

975

himself because in his view he was no longer needed. This view is supported by Sauey's own actions; Sauey never indicated during his testimony that he desired or asked for Felland's continued presence or that during the negotiations he expected Felland to do more than he did. Therefore, Nordic Group cannot successfully argue now, after it has profited from Felland's work, that Felland failed to do what it asked him to do.

¶ 21. Next, Nordic Group argues that there was no written agreement that Felland "was to receive a commission for providing funding for any and all of Sauey's stronger, more attractive companies." Presumably, Nordic Group is suggesting that Felland would therefore not be entitled to a commission for any loan commitment that he originated if it included these stronger companies as part of the financing package.

¶ 22. First, we have already concluded that a failure to comply with the writing requirement of Wis. ADMIN. CODE § RL 43.04(5) does not render an agreement unenforceable, and Nordic Group has not referred us to any legal authority that would otherwise require their agreement to be in writing. Although there was conflicting testimony regarding whether Sauey directed Felland to seek funding for companies other than the initial four, the circuit court believed Felland, who testifed that Sauey had authorized an expanded search. We cannot conclude that the circuit court's finding that an oral agreement existed is clearly erroneous. *See Benkoski v. Flood*, 2001 WI App 84, ¶ 9, 242 Wis. 2d 652, 626 N.W.2d 851 (applying clearly erroneous standard of review to circuit court's finding that parties had reached an agreement).

¶ 23. The letters sent by Felland to Sauey strongly suggest that their agreement covered more than just the original companies. In Felland's April 29

letter, he discusses his efforts for Sauey as they relate to "your consolidated group of companies." In his May 11 letter, he refers to "the subject of consolidating your various companies," and advises Sauey to exclude Columbia Parcar from "the restructured consolidated entity" due to its financial difficulties.

¶ 24. Nordic Group does not claim that Sauey ever told Felland he was mistaken in his belief that he was authorized to find financing for a consolidated group of companies. As the circuit court noted, Sauey made it clear in other circumstances when he disagreed with Felland's course of action, such as when Sauey informed Felland that he would not be contacting Bank One because he was already working with them. Therefore, it is unlikely that Sauey would have simply allowed Felland to continue working under the false assumption that he was seeking funds for an entirely wrong group of companies since this would have been wholly counterproductive from both parties' point of view.

¶ 25. In both its main and reply briefs, Nordic Group attempts to explain Sauey's silence by suggesting that he believed the consolidated group referred only to "a consolidated group of the Original Companies and property." This is not, however, what Sauey testified to at trial. Rather, when asked, "[A]re you aware in follow-up correspondence Mr. Felland specifically directed your attention to work he was doing for your consolidated group of companies?" Sauey answered, "Well, he could say anything. I didn't—that has nothing to do with what I agreed to." Because Sauey's explanation is directly at odds with his trial testimony, it is unpersuasive.

¶ 26. Finally, Nordic Group contends that Felland failed to comply with the terms of the agreement because Columbia Parcar, Snow Valley, and the Deer-

977

field building were not parties to the credit agreement. Because these three entities were all part of the original agreement, Nordic Group contends that Felland was required to originate a loan commitment that included each of them before he was entitled to a commission. As Nordic Group concedes, however, one of the original companies, Pacjets, was a party to the agreement, and at least Columbia Parcar can be advanced as much as $2,000,000 without prior consent of the bank. Further, there is no evidence that the consolidated group of companies necessarily included *all* of the companies that were included in the initial agreement.

¶ 27. Perhaps most important is the fact that Sauey *chose* to accept a credit agreement that did not include Snow Valley and the Deerfield building. Had Sauey considered it essential to have those two entities included in a loan commitment, he could have rejected LaSalle's offer and waited to find another bank that would include them. Evidently, however, he decided this was the best offer that he could obtain. Were we to accept Nordic Group's argument, we would be allowing parties to refuse to pay loan solicitors their commission any time the party chose to accept an offer that was less than ideal. Felland originated a loan commitment with LaSalle that was accepted by Sauey, and that was all he was required to do under the agreement. Therefore, Felland is entitled to his commission.

### C. Dismissal of Sauey

¶ 28. After the trial, Sauey filed a motion with the circuit court requesting that he be dismissed from the case because the evidence at trial demonstrated that he had been acting solely as an agent for his companies

and not for himself. The court agreed and dismissed Sauey from the case. Felland argues that Sauey waived an agency defense because he did not aver in his answer that he was acting solely as an agent or specifically argue this issue at trial. Whether Sauey waived his right to assert agency as a defense is a question of law that we review de novo. *See Lentz v. Young,* 195 Wis. 2d 457, 467, 536 N.W.2d 451 (Ct. App. 1995).

■

¶ 29. Felland was not required to prove that Sauey was acting in a personal capacity. When agency is an issue in a case, the general rule is that the burden of proof lies with the party asserting the existence of the agency relationship. *See Boehck Constr. Equip. Corp. v. Voigt,* 17 Wis. 2d 62, 71, 115 N.W.2d 627 (1962). Further, as a general rule of pleading, plaintiffs are not required to anticipate defenses which defendants may raise and thus are not required to negate potential defenses in their complaint. *Robinson v. Mount Sinai Med. Ctr.,* 137 Wis. 2d 1, 16, 402 N.W.2d 711 (1987). Felland named Sauey individually in his complaint. If Sauey wished to claim that he was not a proper party defendant because he was acting an as an agent, he was obligated to raise this issue in his answer or in a separate motion or it was waived. *See Oetzman v. Ahrens,* 145 Wis. 2d 560, 571, 427 N.W.2d 421 (Ct. App. 1988); *Lentz,* 195 Wis. 2d at 467. Sauey did not raise the issue, however, until after the trial concluded, when it was too late to take testimony on the issue. We therefore conclude that Sauey waived his right to argue that he was acting only as an agent. The circuit court erred in dismissing Sauey from the case. Upon remand, the circuit court will issue an amended judgment that includes Sauey as a judgment debtor.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.