COURT OF APPEALS
DECISION
DATED AND FILED

March 26, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2083**

STATE OF WISCONSIN

Cir. Ct. No. 2023CV220

IN COURT OF APPEALS
DISTRICT IV

---

M & D TRUCK & EQUIPMENT SALES LLC,

   PLAINTIFF-RESPONDENT-CROSS-APPELLANT,

 V.

DANIEL AMAREI,

   DEFENDANT-APPELLANT-CROSS-RESPONDENT.

---

APPEAL from an order of the circuit court for Green County: FAUN MARIE PHILLIPSON, Judge. *Affirmed in part, reversed in part and cause remanded for further proceedings.*

Before Graham, P.J., Blanchard, and Kloppenburg, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.    Daniel Amarei appeals a money judgment that the circuit court entered in favor of M & D Truck and Equipment Sales LLC ("M&D") following a bench trial.  Specifically, the court determined that Amarei is liable for $1,498 in contract damages and $11,983.32 in unjust enrichment damages resulting from his lease of construction equipment over a period of time that exceeded a month.  On appeal, Amarei argues that the court misinterpreted the weekend lease contract that he signed with M&D, and that he is not liable for some of the damages that are included in the judgment.  He also argues that the court erred when it denied his request for a mistrial.  We reject Amarei's arguments and affirm.

¶2    M&D cross-appeals the judgment.  It argues that the circuit court erred when it determined that Amarei is not required to pay prejudgment interest or M&D's reasonable collection costs, including attorney fees, under the terms of the weekend lease contract.  We conclude that M&D is correct, but only in part, and we reverse and remand to the circuit court for further proceedings consistent with this opinion.

## BACKGROUND

¶3    The following facts are derived from the testimony and exhibits introduced during a three-day bench trial, and from the circuit court's written decision, which includes findings of fact and conclusions of law.

¶4    M&D is a limited liability company located in Green County, Wisconsin, and is in the business of leasing heavy construction equipment.  M&D leases equipment to customers by the day, the week, or the month, and its website lists the daily, weekly, and monthly rental rates for each type of equipment that it

leases. M&D also sometimes leases equipment to "do it yourself" customers over a weekend for a reduced rate.

¶5 Amarei owns a parcel of land in Green County. He is an experienced businessperson who holds degrees in business and economics. He is "very familiar" with the type of construction equipment that M&D leases, having executed "thousands of lease agreements" for similar equipment in the past.

¶6 The events leading to this appeal began in February 2023, when Amarei undertook to construct ATV trails across his Green County property. Amarei visited the M&D website to review its rates for the construction equipment he would need for the project, and he then spoke with M&D's rental coordinator, Richard Wyttenbach, by phone. During the call, Amarei and Wyttenbach discussed an arrangement by which Amarei would lease the equipment he needed over the weekend of Saturday, February 25, and Sunday, February 26.

¶7 Wyttenbach sent Amarei a written contract to that effect, which was memorialized on a standard form lease agreement that M&D uses with all of its customers. The contract provided that Amarei would be leasing a skid loader with a grapple attachment.[1] The contract further provided that the weekend rate for the skid loader was $1,388, and it included a note stating that the "Weekend Rate Allows 12 hours on [the] meter" and that "[o]verages" would be "billed at $116/hour." Although there was no explicit end date specified in the contract, a section entitled "Estimated Date Out" stated that the lease was for "FRI 2/24 for

---

[1] Skid loaders are compact four-wheeled engine-powered machines that are equipped with load arms and can be used for tasks such as digging, grading, and moving materials.

W/E." Going forward, we refer to this written contract as the "Weekend Lease Agreement" or the "Agreement."

¶8 The Weekend Lease Agreement also contained a number of standard terms and conditions, including terms related to the accrual of prejudgment interest and collection costs, which we discuss in more detail as needed below. Among the terms and conditions were a "rental charges" provision, which provided that "[r]ental charges begin when the equipment leaves our yard and end when it is returned," and a "modifications" provision, which provided that "[n]o alteration or modification of this Lease is valid unless in writing and signed by the parties hereto."

¶9 M&D and Amarei both signed the Weekend Lease Agreement, and it is undisputed that this was the only written contract they entered into over the course of their relationship. However, as discussed in greater detail below, some of M&D's equipment remained at Amarei's property through the end of March, and Amarei also requested delivery of additional equipment from M&D during this time. For convenience, this opinion sometimes refers to February 25-26 as the "initial weekend period" and to the time that equipment remained on Amarei's property after that weekend as the "post-weekend period."

¶10 After the equipment was delivered to Amarei's property, Amarei and Wyttenbach had at least four discussions about lease terms that are pertinent to this appeal. The first discussion occurred on February 27, the Monday following the initial weekend period. That morning, Wyttenbach texted Amarei to check to see if Amarei was "finished up" with the equipment; Amarei responded that he was "not quite done." In a phone call that followed, Amarei and Wyttenbach agreed that Amarei would retain the skid loader and grapple attachment beyond

the initial weekend period, but the parties disputed the terms of that arrangement at trial. Wyttenbach testified that he told Amarei that there would be no charge for that "Monday or Tuesday" and that the equipment "went back on rent on Wednesday," but Amarei testified that Wyttenbach "didn't talk about [rental] charges whatsoever."

¶11 The second discussion occurred on March 14, when Amarei and Wyttenbach arranged to "swap out" the skid loader that Amarei had in his possession (the "first skid loader") with a smaller skid loader that was available (the "second skid loader"). The parties dispute who initiated the "swap out" arrangement and the terms of that arrangement. Wyttenbach testified that he told Amarei that M&D would begin charging rent for the second skid loader on "Saturday the 18th of March," but Amarei testified that Wyttenbach did not say anything about rent. It is undisputed that M&D picked up the first skid loader on March 14 and delivered the second skid loader to Amarei's property that day.

¶12 The third discussion occurred on March 20. Amarei called to ask M&D to drop off a pallet fork attachment, and M&D dropped off the attachment that day.

¶13 The fourth discussion occurred on March 22. It is undisputed that Amarei and Wyttenbach spoke by phone that morning, but the content of their conversation is disputed. Amarei testified that he told Wyttenbach that the equipment would be ready for pick up that day, but Wyttenbach testified that Amarei did not make any such pick up request until March 30. M&D did not pick up the remaining equipment (the grapple attachment, the second skid loader, and the pallet fork attachment) from Amarei's property until March 31.

¶14    Additionally, Amarei also had several conversations with M&D's service technician, Ben Jansen, about the condition of M&D's equipment during the time that its equipment was at Amarei's property.  Jansen made at least two service calls to the property, and we discuss the evidence about those service calls as needed below.

¶15    In May 2023, M&D sent Amarei an invoice that sought payment of $13,868.13.  Specifically, M&D's invoice sought payment of the "weekend rate" set forth in the Weekend Lease Agreement for the initial weekend period, and payment of its posted weekly rates for the equipment that Amarei possessed during the post-weekend period from March 1 to March 30.  The invoice also reflected charges for delivery, fuel, and repair costs.

¶16    Amarei emailed to dispute the accuracy of the invoice, writing that the charges "do not mirror the agreement we both signed."  Specifically, Amarei stated, he understood the Weekend Lease Agreement to provide that he would be billed the weekend rate specified in the agreement, not "on a per day or week basis."  That is, Amarei took the position that, even though he retained equipment far beyond a weekend, he should only be billed the weekend rate of $1,388, unless he actually used the skid loader for more than 12 hours in total.  In that case, Amarei's position was that he should be billed the "overage rate" provided in the agreement: an additional $116 per hour for each hour of additional use.  Amarei wrote: "Did I not read the contract correctly?  If not, would you kindly highl[ight] the language where you switch from billing per hour and changing it to weeks?"

¶17    In its response, M&D wrote that the Weekend Lease Agreement was just "for the weekend" and "the weekend rent was over on Sunday night."  M&D explained that all of its contracts "are by time, with engine hour limits[,] … 8 per

6

day, 12 per weekend, 40 per week," and that M&D "never rent[s] by the hour." M&D further explained that the "overage" rate in the Agreement "only applied if you put more than 12 hours on the unit during that weekend rental." M&D took the position that its posted weekly rates began to apply when Amarei retained the equipment beyond the initial weekend period.

¶18 M&D eventually filed this action. It alleged that Amarei had failed to pay M&D "the sums due under the terms of the rental agreements." Amarei denied liability and alleged that M&D did not "correctly state the amount owed."

¶19 The case proceeded to a three-day bench trial, in which the central dispute was over the scope of the Weekend Lease Agreement and the amount that Amarei owes in damages. M&D took the position that Amarei is liable for the total amount stated in its invoice, plus interest, attorney fees, and costs. Specifically, M&D argued that Amarei is liable for contract damages for the initial weekend period under the Weekend Lease Agreement. For the post-weekend period, M&D argued, Amarei is liable for its posted rates—either because there was an implied contract between the parties based on their words and conduct, or based on a theory of unjust enrichment.

¶20 M&D offered the Weekend Lease Agreement into evidence, and Wyttenbach testified about the various conversations he had with Amarei following the initial weekend period. In addition, M&D called its service technician, Jansen, to testify about the two service calls he made to Amarei's property. Among other things, Jansen testified that he was able to repair the issues with the equipment on site and that he made sure that the equipment was functioning properly before he left.

¶21 Amarei represented himself, and he was the sole witness who testified for the defense. Amarei testified that the Weekend Lease Agreement was the "only contract" he signed, and his position was that the entire leasing arrangement is covered by the weekend rate set forth in the Agreement. He took the position that, although he arranged to retain M&D's equipment beyond the initial weekend period, this arrangement did not result in additional charges because "[n]ot one time did [Wyttenbach] mention to me that, hey, if this stays on your property, we're gonna need to charge you for every day it's on there."

¶22 In addition to disputing the scope of the Weekend Lease Agreement, Amarei made arguments about the condition of the equipment that M&D provided. Specifically, he testified that M&D's equipment was "defective" throughout the entirety of the time he possessed it, and for that reason Amarei did not receive the "full benefit" of possessing the equipment beyond the initial weekend period. Amarei also argued that he was not liable for any charges after March 22 based on his testimony that he had asked M&D to pick up the equipment on that date.

¶23 On the final day of trial, Amarei asked the circuit court to declare a mistrial after he found a post-it note in the binder of exhibits that had been used by the trial witnesses. The court heard arguments about the request and, after a brief recess during which it examined the note and exhibits binder, it denied the motion. We provide additional background about Amarei's mistrial motion and the court's decision as needed below.

¶24    The circuit court entered a written order awarding M&D $13,481.32 in damages.[2]    Specifically, the court determined that the Weekend Lease Agreement is a "valid contract" and that Amarei is liable under that contract, but the court agreed with M&D that the Agreement established Amarei's liability and M&D's contract damages for the initial "weekend period" only.  With respect to the post-weekend period, the court found that Amarei is liable based on a theory of unjust enrichment, and that the most appropriate measure of unjust enrichment damages is M&D's posted weekly rates for the various pieces of equipment that Amarei possessed in the post-weekend period.  In reaching this conclusion, the court rejected M&D's argument that there were implied contracts between the parties.  The court reasoned that a mutual agreement (sometimes referred to as a "meeting of the minds") with respect to contract terms is required to form an implied contract, and that "[h]ere, it is unclear whether the minds of M&D and Mr. Amarei met on the same thing."

¶25    Turning to M&D's request for an award of prejudgment interest and collection costs, including attorney fees, the circuit court denied the request.  The court explained that the request was based on written contract terms, but that here, "much of this damage award arises from the legal theory of unjust enrichment, and falls outside the four corners of the Weekend Lease Agreement."  Under these circumstances, the court determined, each side is "responsible for the payments of their own costs and fees."

---

[2] The damages awarded are slightly less than what was set forth in M&D's invoice because at trial M&D's counsel stipulated to removing some charges in the invoice related to repairs and delivery.

¶26     The circuit court entered judgment, and this appeal and cross-appeal followed.

## DISCUSSION

¶27     In Amarei's appeal, he challenges the circuit court's damages award and the court's denial of his request for a mistrial.  In M&D's cross-appeal, it challenges the portion of the judgment that denied its request for prejudgment interest and collection costs.  We address the three issues in that order.

### I.  Amarei's Appeal of the Damages Award

¶28     Beginning with the damages award, Amarei argues that the primary error that the circuit court made was to conclude that the Weekend Lease Agreement—and the "weekend rate" it described—was no longer in effect after Sunday, February 26.  On the contrary, Amarei contends, the Agreement was in effect throughout the entire period of time he possessed M&D's equipment.  Therefore, he argues, his liability is limited to the "weekend rate" that is specified in the Agreement, and the court erred when it determined that he is also liable for M&D's posted weekly rates during the post-weekend period based on a theory of unjust enrichment.

¶29     We begin by resolving the threshold issue of the scope and duration of the Weekend Lease Agreement.  After determining that it was in effect for the initial weekend and no longer, we consider Amarei's various arguments against his liability for the weekly rates during the post-weekend period.

## A. The Scope and Duration of the Weekend Lease Agreement

¶30    "The interpretation of a contract presents a question of law, which we determine independently of the conclusions rendered by the circuit court …." *See Tufail v. Midwest Hospitality, LLC*, 2013 WI 62, ¶22, 348 Wis. 2d 631, 833 N.W.2d 586.  Here, Amarei's argument turns on the proper interpretation of the Weekend Lease Agreement, and specifically its scope and duration.

¶31    Amarei first argues that the term of the Weekend Lease Agreement is unambiguous.  Specifically, he argues that the Agreement did not include any "provision automatically terminating on [Monday,] February 27," or providing that the "'weekend' is strictly two days."  He contends that the circuit court in effect created a "termination date" for the contract when there is no "evidence of [such] mutual agreement" between the parties.

¶32    We disagree.  Although the Weekend Lease Agreement did not explicitly identify a termination date, its language cannot reasonably be understood to mean anything other than that its term was limited to the weekend that ended on Sunday, February 26.  As noted, the "Estimated Date Out" section of the Agreement stated "FRI 2/24 for W/E," and the section specifying the "initial term" of the rental stated "WKend."  Likewise, in the section about rates, the Agreement referred to the rate as the "Weekend Rate."  "We presume the parties' intent is evidenced by the words they choose[] if those words are unambiguous," *Kernz v. J.L. French Corp.*, 2003 WI App 140, ¶9, 266 Wis. 2d 124, 667 N.W.2d 751, and here, the parties' words all point to the Agreement being for the "weekend."

¶33    Beyond that, even if the Weekend Lease Agreement could be considered ambiguous, the conversation that the parties had leading up to contract

execution forecloses any argument that the Agreement was intended to apply beyond the initial weekend period. *See **Tufail***, 348 Wis. 2d 631, ¶27 ("If the terms of the contract are ambiguous, evidence extrinsic to the contract itself may be used to determine the parties' intent."). As noted, it is undisputed that Wyttenbach and Amarei spoke over the phone to discuss the rental, and Wyttenbach filled out M&D's form agreement based on their conversation. Wyttenbach testified that Amarei asked to rent the equipment for "that weekend" and Wyttenbach memorialized that understanding in the draft contract, which Amarei signed. For his part, Amarei testified that he was "very clear" with Wyttenbach that he only had "two days" to use the equipment, and during cross-examination, he admitted that the Agreement "was only meant for a weekend."

¶34 Our conclusion is further supported by the parties' actions after the Weekend Lease Agreement was signed. *See **Board of Regents of Univ. of Wis. Sys. v. Mussallem***, 94 Wis. 2d 657, 671, 289 N.W.2d 801 (1980) (also relevant is what occurred "before and after the signing of an agreement"). On the morning of Monday, February 27, Wyttenbach texted Amarei to confirm that Amarei was "finished up" with the equipment, and the parties had a phone call to discuss Amarei keeping the equipment at his property. There would be no occasion for Wyttenbach to confirm that Amarei was done with the equipment, and no need for the parties to negotiate the circumstances of keeping the equipment, if the Agreement already contemplated that Amarei could retain the equipment beyond the weekend.

¶35 Amarei argues that this interpretation ignores "explicit contract language." Specifically, he points to the "rental charges" provision which, as noted, states that "[r]ental charges begin when the equipment leaves our yard and end when it is returned." According to Amarei, this provision "contemplates [that]

12

the parties' arrangement continues so long as [he] retains possession" of the equipment; thus, he contends, the weekend rate was in effect for the entire time he retained possession.

¶36 This argument is not persuasive. Nothing in the "rental charges" provision purports to modify the term of the Weekend Lease Agreement, nor does it specify the rate of "rental charges" that a customer will be charged if the customer retains equipment beyond that term. Rather, the provision simply means that customers will be liable for rental charges until M&D's equipment "is returned." In so doing, the provision memorializes the commonsense notion that a customer who retains equipment beyond the term of the lease will be required to pay additional rent for that additional time.

¶37 Indeed, if Amarei's argument were correct—that he could extend the term of the Weekend Lease Agreement simply by retaining the equipment in his possession—that would run afoul of the provision in the Agreement that provides that "[n]o alteration or modification of this Lease is valid unless in writing and signed by the parties hereto."

¶38 For all these reasons, we conclude that the Weekend Lease Agreement was intended to cover the period of Saturday, February 25, to Sunday, February 26, and no longer.

## B. The Post-Weekend Period

¶39 Having concluded that the Weekend Lease Agreement governed the rent that Amarei owed during the initial weekend period, we now consider Amarei's challenges to his liability during the post-weekend period.

¶40     The post-weekend period spanned from Monday, February 27, until the equipment was picked up on March 31, and it covered Amarei's continued lease of the first skid loader and grapple attachment, his lease of the second skid loader (after the first skid loader was swapped out), and his lease of the pallet fork attachment.  As noted, for this period, M&D billed Amarei based on its posted weekly rental rates for the different pieces of equipment.  The circuit court found that there was no contract in effect (written or otherwise) during this period, but it determined that Amarei is liable for M&D's posted weekly rates based on a theory of unjust enrichment and awarded M&D $11,983.32 in damages for this period.

¶41     Amarei's most prominent challenge to the award of unjust enrichment damages is based on the argument that we rejected above.  That is, he takes the position that it was error to award damages for unjust enrichment because, he contends, the Weekend Lease Agreement was in effect and covered the entirety of the post-weekend period.  *See **Mohns Inc. v. BMO Harris Bank N.A.***, 2021 WI 8, ¶48, 395 Wis. 2d 421, 954 N.W.2d 339 (if the parties entered into a valid and enforceable contract that covers certain conduct, unjust enrichment does not apply).  This argument fails based on our conclusion that the Agreement was no longer in effect following the initial weekend period.

¶42     Amarei makes two additional challenges to the award of post-weekend unjust enrichment damages, both of which would require us to credit his version of disputed facts.  He argues that M&D did not prove the elements of unjust enrichment because its equipment was defective.  He also argues that, even if we are to conclude that the elements are satisfied, he does not owe as much in damages as the circuit court awarded because he was done with the equipment as of March 22.  We address each argument in turn.

14

### 1. Unjust Enrichment

¶43 Our review of the circuit court's determination on an unjust enrichment claim presents a mixed question of fact and law. *Halverson v. River Falls Youth Hockey Ass'n*, 226 Wis. 2d 105, 115, 593 N.W.2d 895 (Ct. App. 1999). We will uphold the court's factual findings unless they are clearly erroneous, but "[t]he application of those facts to the legal standard for unjust enrichment … presents a question of law we review de novo." *Id.*

¶44 As applied here, the elements of unjust enrichment are that: M&D "conferred" a "benefit" on Amarei; Amarei had "appreciation or knowledge … of the benefit"; and Amarei accepted or retained the benefit "under circumstances making it inequitable for [him] to retain the benefit without payment of its value." *See Puttkammer v. Minth*, 83 Wis. 2d 686, 689, 266 N.W.2d 361 (1978). After considering the trial evidence, the circuit court found that Amarei told M&D that "he was not finished with the equipment" several times throughout the post-weekend period, that M&D allowed Amarei to continue to possess its equipment, and that Amarei continued to use it for at least some of the time it remained on his property. Under the circumstances, the court determined that it would be inequitable for Amarei, who was an "experienced businessperson" and had dealt with "numerous [leasing] contracts" in the past, "to retain the [equipment on his property and use it] without payment of its value." *See Puttkammer*, 83 Wis. 2d at 689. Based on our review of the record, we conclude that the court's factual findings are not clearly erroneous and that the elements of an unjust enrichment claim are satisfied.

¶45 Amarei argues that he did not derive or retain a benefit from M&D because, he asserts, the equipment was defective. Amarei's argument begins with

the undisputed fact that the first skid loader was not working properly when it was delivered on Friday, February 24. Although M&D sent its service technician, Jansen, to fix the equipment that same day, Amarei asserts that Jansen did not actually fix the problem until March 1, when Jansen returned to address what Amarei characterizes as "lingering issues." Due to these "persistent mechanical defects," Amarei argues, he was unable to "complete his project as planned during the initial weekend rental period, undermining any claim of benefit." We reject this argument for at least two reasons.

¶46 First, Amarei's assertion that the equipment was defective is contrary to the circuit court's findings of fact. The court heard testimony from both Amarei and Jansen on this issue, and it was within the court's discretion to decide which testimony to credit. *See Noll v. Dimiceli's, Inc.*, 115 Wis. 2d 641, 644, 340 N.W.2d 575 (Ct. App. 1983) ("[W]here there is conflicting testimony, the trial judge is the ultimate arbiter of the credibility of the witnesses."). Here, the court credited Jansen's testimony that he fixed the issues with the first skid loader on the Friday it was delivered and that the equipment was operating as it should when Jansen left that day. The court also credited Jansen's testimony that he fixed a different set of issues on March 1, and that those issues were the result of Amarei's improper use of the skid loader. Amarei appears to be arguing that the court should have credited his testimony instead, but again, it was within the court's discretion to determine "the weight to be given to each witness's testimony." *State v. Peppertree Resort Villas, Inc.*, 2002 WI App 207, ¶19, 257 Wis. 2d 421, 651 N.W.2d 345. The court did not erroneously exercise its discretion by crediting the testimony from Jansen over the conflicting testimony from Amarei.

¶47    Second, even if we were to accept the premise that the equipment was defective in some way, that premise would not necessarily lead to a conclusion that Amarei did not benefit from retaining the equipment. As noted, it is undisputed that Amarei was able to use the equipment to complete the work on his property and that he chose to retain the equipment that he now contends was defective. Accordingly, the record supports the circuit court's determination that M&D conferred a benefit upon Amarei.

## 2. Dispute About the Pick-Up Date

¶48    We now turn to Amarei's arguments about the end date for the unjust enrichment damages. As noted, the circuit court awarded unjust enrichment damages through March 30. On appeal, Amarei argues that this was error for at least three reasons and that he should not be liable for any damages after March 22.

¶49    First, Amarei argues, he "explicitly" testified that he requested that M&D pick up the equipment on March 22. He asserts that his trial testimony about the pick-up request was "unchallenged" and argues that "the circuit court's refusal to credit it [was] … clearly erroneous."

¶50    Contrary to Amarei's argument, his testimony in this regard did not go unchallenged at trial. As mentioned, Wyttenbach also provided testimony about the circumstances surrounding the pick-up request, which the circuit court appears to have credited. Specifically, when asked whether he knew that March 22 was the final day that Amarei needed the equipment, Wyttenbach testified, "I did not ever know that," and when asked when Amarei first asked for the equipment to be picked up, Wyttenbach testified, "I would say the 30th." In addition to that testimony, the court relied on Amarei's text messages to M&D,

17

which the court interpreted to show that, as late as 12:22 p.m. on March 22, Amarei was still using the equipment and was communicating with Jansen about how to connect certain equipment. The court found that there were "no text messages" from Amarei at any point during that day "indicating" that he was done with the equipment or that it "should be picked up." The court's findings about the circumstances of the pick-up request were not against the "great weight and clear preponderance of the evidence." *See Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶12, 290 Wis. 2d 264, 714 N.W.2d 530.

¶51 Second, Amarei argues that that the circuit court relied on "questionable" evidence in making its findings about the pick-up request. According to Amarei, the "questionable" evidence was a calendar containing Wyttenbach's handwritten notes. As we understand it, Wyttenbach did not write the notes contemporaneously with the events that transpired, but wrote them instead in the months that followed, during a time in which Amarei was disputing M&D's invoice and Wyttenbach was attempting to explain what had occurred to M&D's owner.

¶52 Amarei contends that the circuit court erroneously credited Wyttenbach's "self-serving" calendar over his "direct sworn testimony." This argument is unavailing because the calendar did not contain any information about the timing of any pick-up request. Additionally, nothing in the record supports Amarei's assertion that the court relied on the calendar to make factual findings on that topic; indeed, the court did not mention the calendar in its written decision.[3]

---

[3] To the extent that Amarei may intend to argue that the circuit court relied on the calendar to make other findings and determinations beyond those related to pick-up, he does not point us to anything in the record to support any such conclusion that the court did so.

18

¶53     Third, Amarei asserts that the circuit court's determination about when the equipment was ultimately picked up from his property was based on "secondhand accounts." Specifically, Amarei argues that M&D's driver, "Doug," is the only person who would have had "firsthand knowledge" of when pick-up occurred, and that the court should have drawn a negative inference against M&D because it "declined to present Doug as a witness."

¶54     There are at least two problems with this argument. First, if Amarei wanted the circuit court to draw a negative inference based on M&D's failure to present Doug's testimony, it was incumbent on Amarei to ask the court to draw such an inference during the trial proceedings. He did not make that request during that time, and it is too late to make it for the first time on appeal. Second, it is not at all clear that it would have been appropriate for the court to draw a negative inference based on Doug's absence from the trial as a witness, even if Amarei had requested it. Our supreme court has explained that a factfinder should not draw a negative inference based on the absence of a witness whose testimony "would be merely cumulative" to other evidence that is introduced at a trial. *Kochanski v. Speedway SuperAmerica, LLC*, 2014 WI 72, ¶17, 356 Wis. 2d 1, 850 N.W.2d 160. Here, Doug's testimony about the pick-up date would have been cumulative to testimony from Jansen, who testified that he was present when the equipment was ultimately retrieved from Amarei's property.

¶55     Accordingly, Amarei has not persuaded us that the circuit court erred when it determined that he is liable for unjust enrichment damages through March 30.

## II.  Amarei's Challenge to the Denial of His Mistrial Motion

¶56    Amarei also argues that the circuit court erred in denying his request for a mistrial.  For reasons we now explain, we disagree.

¶57    The decision to grant a mistrial is within a circuit court's discretion. *Jensen v. McPherson*, 2004 WI App 145, ¶29, 275 Wis. 2d 604, 685 N.W.2d 603. The court must determine, "in light of the whole proceeding," whether the claimed error was sufficiently prejudicial that a mistrial is necessary to protect a party's rights.  *See Oseman v. State*, 32 Wis 2d. 523, 528-29, 145 N.W.2d 766 (1966). We will reverse a circuit court's decision to grant or deny a mistrial "only on a clear showing of an erroneous use of discretion."  *Jensen*, 275 Wis. 2d 604, ¶29.

¶58    As mentioned, Amarei's claim that a mistrial should have been granted is based on a post-it note that he found inside the exhibit binder that was being used by M&D's trial witnesses.  Specifically, as he was being cross-examined about Wyttenbach's calendar, which had been admitted as a trial exhibit, Amarei found a note stuck to the calendar.  The note read: "Text to Ben on the 22nd, pictured on Page 14, Doc 16."  On finding the note, Amarei asked, "Your Honor, [are] there supposed to be post-its inside of this with notes?" Shortly thereafter, Amarei said, "If that's not a mistrial, I don't know what is."

¶59    The circuit court gave Amarei the opportunity to present argument about why a mistrial might be warranted.  Amarei argued that the post-it note suggested that M&D's witnesses "had help" with their testimony, and he raised the concern that there might have been more notes "guiding the[] testimony." M&D's counsel represented that he did not write the note or place it inside of the witness binder.  Amarei responded that, in his view, the testimony from M&D's witnesses was "corrupt" and a mistrial was required.

¶60    After a brief recess, the circuit court denied the mistrial request.  The court acknowledged that it did not know who wrote the note or how it got into the binder, but from the court's perspective, the note had "no meaning" and was harmless.  The court explained that it had reviewed the "entire witness binder" and found that "none of the rest of [the pages] have any notations or post-it notes or otherwise."  Under these circumstances, Amarei had not persuaded the court that the "drastic measure" of a mistrial was "appropriate" or "necessary."

¶61    On appeal, Amarei argues that the circuit court's inquiry into the note was insufficient to determine if any witness had been "improperly influenced."  Among other things, he argues that the court should have attempted to ferret out "who wrote [the note]," "[w]hether it was created before or during trial," "[i]f witnesses saw or used it," and "[i]f it [was] aligned with themes or content from M&D's testimony."  However, it was Amarei's burden to demonstrate that such action was necessary, and he did not make any such showing.  *See* ***State v. Harrell***, 85 Wis. 2d 331, 337, 270 N.W.2d 428 (Ct. App. 1978) (the party seeking a mistrial has the burden of demonstrating that grounds exist for a mistrial).

¶62    We conclude that the circuit court appropriately exercised its discretion with respect to the mistrial request.  We agree with the court that on its face, the note appears to be innocuous.  Although Amarei asserts that M&D was using the note to "bolster witness recollection" and "guide [witness] testimony," Amarei does not elaborate on this assertion in any meaningful way.  Nor does Amarei explain why, if the note had been intended to refresh a witness's recollection about the existence of text messages, that would warrant the drastic remedy of a mistrial.

¶63 When a mistrial is demanded, a circuit court is free to impose a less drastic remedy. *See State v. Givens*, 217 Wis. 2d 180, 191, 580 N.W.2d 340 (Ct. App. 1998) (providing that "not all errors warrant a mistrial and [that] 'the law prefers less drastic alternatives, if available and practical'" (citing *State v. Bunch*, 191 Wis. 2d 501, 512, 529 N.W.2d 923 (Ct. App. 1995))). Under the circumstances here, the court was aware of the note and if it caused the court to question the credibility of any particular testimony, the court was free to take the note's existence into account as part of its decision.

### III. M&D's Cross-Appeal with Respect to Prejudgment Interest and Attorney Fees

¶64 We now address M&D's cross-appeal of the portion of the judgment that denied M&D's request for prejudgment interest and reasonable collection costs, including attorney fees. In its cross-appeal, M&D argues that it is entitled to prejudgment interest and collection costs under the terms of the Weekend Lease Agreement. We agree, but only in part. As we now explain, we conclude that the circuit court erred when it did not award any interest or collection costs related to the portion of the damages award that is based on the Agreement, but that the court correctly determined that M&D is not entitled to interest or fees with respect to the portion of the damages award that is based on unjust enrichment, and we remand for the court to exercise its discretion to determine the amount.

¶65 With regard to litigations costs, Wisconsin follows the "American Rule," which provides that "parties to litigation typically are responsible for their own attorney fees." *Estate of Kriefall v. Sizzler USA Franchise, Inc.*, 2012 WI 70, ¶¶71-72, 342 Wis. 2d 29, 816 N.W.2d 853. "Limited exceptions do exist," however, including when "the parties contract for the award of attorney fees." *Id.* Likewise, "when the parties explicitly agree … [in] contract … that damages will

… include prejudgment interest, the parties will be held to that agreement, whether or not interest would be proper without such an agreement." *Klug & Smith Co. v. Sommer*, 83 Wis. 2d 378, 382, 265 N.W.2d 269 (1978).

¶66     Thus, whether M&D is entitled to attorney fees and prejudgment interest turns, at least in part, on the interpretation of the Weekend Lease Agreement. We review the interpretation of a written contract, including whether it provides for attorney fees and prejudgment interest, de novo. *See Jos. P. Jansen Co. v. Milwaukee Area Dist. Bd. of Vocational, Tech. and Adult Educ.*, 105 Wis. 2d 1, 13, 312 N.W.2d 813 (1981).

¶67     Here, as noted, the Weekend Lease Agreement provided that Amarei agreed to certain standard terms and conditions. More specifically, it provided: "BY SIGNING THIS LEASE, LESSEE … AGREES TO THE TERMS AND CONDITIONS SET FORTH ON PAGE 1 AND PAGE 2 OF THIS LEASE AGREEMENT." And as pertinent here, the standard terms and conditions included the following:

> 10. In consideration for the extension of credit, said business promises to pay for all purchases within the terms agreed (due upon receipt of invoice) and agrees to pay a service charge per month of 1 1/2% per month (18% annual percentage rate) on all past balances due….
>
> 11. In the event any third parties are employed to collect any outstanding monies owed by said business the undersigned agrees to pay reasonable collection costs, including attorney fees, whether or not litigation has commenced, and all costs of litigation incurred….

Based on this unambiguous language, Amarei agreed to pay interest "on all past balances due" and to pay "reasonable collection costs, including attorney fees" if a third party was employed to collect "outstanding monies owed."

23

¶68 But that does not end our inquiry. As noted, the circuit court's damages award included two kinds of damages: $1,498 in damages under the Agreement, and $11,983.32 in damages based on unjust enrichment. And here, although the Weekend Lease Agreement unambiguously provides for prejudgment interest and collection costs, the court declined to award any interest or costs under the Agreement on account of the fact that the majority of the damages it awarded were based on unjust enrichment, and not under the Agreement.

¶69 M&D argues that "[a]ssuming the circuit court[] … [is] correct" in its conclusions about unjust enrichment, M&D is entitled to contract-based interest and attorney fees at least with respect to the damages awarded under the Weekend Lease Agreement. We agree, and we remand for the court to make that award. The amount of an attorney fees award is typically left to the court's discretion due to that court's ability to assess the quality of services rendered and the reasonableness of the fees. *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 22, ¶14, 308 Wis. 2d 103, 746 N.W.2d 762. Here, the court should also consider M&D's costs related to the appeal and cross-appeal. *Benkoski v. Flood*, 2001 WI App 84, ¶38, 242 Wis. 2d 652, 626 N.W.2d 851 ("a plaintiff who recovers attorney fees at the trial court level shall recover further attorney fees incurred on a successful defense of the award on appeal").

¶70 But M&D asks us to go further and to order the circuit court to award contract-based interest and attorney fees with respect to the entire damages award, including the portion of the award that the court designated as unjust enrichment damages. M&D advances several different arguments in support of that result, which we now consider and reject.

¶71    One argument that M&D makes is directly contrary to the position it took in the circuit court. That argument is that the Weekend Lease Agreement extended beyond the initial-weekend period into the post-weekend period; therefore, M&D contends, the $11,983.32 in damages for the post-weekend period are contract damages governed by the Agreement. Under the circumstances, M&D contends, the court was wrong to award damages based on a theory of unjust enrichment.

¶72    Regarding this interpretation of the Weekend Lease Agreement, we rejected these same arguments as part of Amarei's appeal. In addition to the reasons we gave for rejecting the argument when Amari made it, there are at least two additional reasons for rejecting the argument now that M&D advances it in its cross-appeal.

¶73    The first reason is the concept of "invited error." In the trial brief that M&D filed with the circuit court, M&D did not argue that the Weekend Lease Agreement covered the post-weekend period. Indeed, its trial brief took the contrary position, stating: "Clearly, the initial contract between the parties was for a weekend only." M&D's brief went on to request that, "[i]n the absence of an express agreement as to compensation" for the post-weekend period, the circuit court should award damages either under implied-in-fact contract or based on unjust enrichment. Accordingly, if it was error to award damages for unjust enrichment, M&D specifically invited the court to make that error. Generally speaking, we will not reverse a court based on an invited error. *See Atkinson v. Mentzel*, 211 Wis. 2d 628, 642-43, 566 N.W.2d 158 (Ct. App. 1997) (when an allegedly erroneous ruling was invited by the appellant during the circuit court proceedings, we "will not review [the] invited error").

¶74 The second reason is that M&D's new argument is unpersuasive. M&D relies on the "rental charges" provision in the Weekend Lease Agreement to show that Amarei agreed that he would be subject to additional rental charges if he kept the equipment beyond the initial weekend.[4] However, price is an essential term of a lease agreement, and the provision that M&D relies on is silent as to the rental rate that Amarei would be charged if he retained equipment beyond the initial weekend period. Accordingly, in the absence of an agreement about price, the rental charges provision does not bring any post-weekend rental charges within the scope of the Agreement. In reality, M&D's argument seeks to modify the Agreement, contrary to the provision in the Agreement that provides that all modifications must be in writing.

¶75 M&D makes an alternative argument about implied contracts that is also unavailing. An implied-in-fact contract is a meeting of the minds that is circumstantially proved by words and conduct which show a mutual intention to contract. *Theuerkauf v. Sutton*, 102 Wis. 2d 176, 306 N.W.2d 651 (1981); *see also* WIS JI—CIVIL 3024 ("An agreement may be established by the conduct of the parties … if from such conduct it can fairly be inferred that the parties mutually intended to agree on all terms."). According to M&D, even if the post-weekend rental charges were not properly awarded under the Weekend Lease Agreement, the evidence of the parties' conduct following the initial weekend period was sufficient to prove the existence of implied contracts, and the circuit court should have awarded post-weekend damages on that basis.

---

[4] As discussed above, *supra* ¶¶8, 35, the rental charges provision provides: "Rental charges begin when the equipment leaves our yard and end when it is returned[.]"

¶76 Even if we were to assume that the parties entered into implied contracts that governed the post-weekend period, that would not mean that M&D's damages under those implied contracts would be subject to the prejudgment interest and collection costs provisions that were part of the Weekend Lease Agreement. The terms that comprise an implied contract are those that are necessarily implied by the parties' words and conduct, and damages under an implied contract are typically limited to the "reasonable value" of the goods or services at issue. *See Theuerkauf*, 102 Wis. 2d at 185; *see also Roeske v. Diefenbach*, 75 Wis. 2d 253, 260, 249 N.W.2d 555 (1977) (addressing an unwritten oral contract and stating that "this court will not import more into an oral contract than is expressed and agreed upon by the parties"). Here, at most, the trial evidence would support the existence of an agreement that M&D would continue to provide equipment and that Amarei would pay for it based on M&D's posted rates. None of the evidence about the parties' words and conduct demonstrate that there was a mutual understanding about terms and conditions involving prejudgment interest and collection costs.

¶77 To the extent that M&D might be arguing that the terms and conditions from the Weekend Lease Agreement were incorporated into any implied contracts based on Amarei's familiarity with those terms as part of M&D's standard written contract, M&D does not point us to any authority for that proposition. And, based on our limited independent research, the law does not

27

appear to support any such argument.[5]  As M&D argued in the circuit court, any implied contract entered into after the initial weekend period "was an entirely new contractual arrangement."

¶78    Finally, M&D argues that it does not matter if the post-weekend damages were based on unjust enrichment, rather than on a contract.  M&D takes the position that it can collect costs with respect to the entire damages award because the pertinent provision in the Weekend Lease Agreement "does not restrict" attorney fees to the damages that occur "within 'the four corners'" of that contract.  In support, M&D points to language in the Agreement that provides that Amarei agreed to pay reasonable collection costs including attorney fees on "any outstanding monies owed."  Thus, M&D contends, it is entitled to its costs with respect to the unjust enrichment award because those damages are "outstanding monies owed."

¶79    We disagree with M&D's interpretation.  "Contractual provisions must be interpreted within the context of the contract as a whole," *MS Real Estate Holdings v. Donald P. Fox Family Trust*, 2015 WI 49, ¶43, 362 Wis. 2d 258, 864 N.W.2d 83, and here, the Weekend Lease Agreement concerns a specific rental transaction between M&D and Amarei.  Thus, we read the terms and conditions in the Agreement as applying to the specific transaction that is set out in that

---

[5] Specifically, WISCONSIN. STAT. ch. 411 (2023-24) governs any transaction that creates a lease, and WIS. STAT. § 411.201(1) is a statute of fraud that provides that lease contracts for more than $1,000 must be in writing and describe the goods leased and the lease term. Paragraph 411.201(4)(c) provides that a lease contract that does not comply with the writing requirement but is valid in other respects may be enforced if the "[g]oods [here, the equipment] have been received and accepted by the lessee [here, Amarei]," but not "beyond the quantity of goods received and accepted."  All references to the Wisconsin Statutes are to the 2023-24 version.

contract. We conclude that Amarei is liable for M&D's collection costs if, based on the transaction described in that contract, he ends up owing M&D "outstanding monies" that require third-party collection. We do not agree that by signing the Weekend Lease Agreement, Amarei also agreed that any future transactions that are not set out in the Agreement would also be governed by all the same terms and conditions.

¶80    In summary on the cross-appeal, we conclude that M&D is entitled to contract-based prejudgment interest and collection costs with respect to the portion of the award that is based on the Weekend Lease Agreement, but not with respect to the portion of the damages award that is based on unjust enrichment. We further conclude that it is within the circuit court's discretion to determine that amount of interest and costs, and we remand for the court to exercise its discretion to determine the amount. On remand, the court should consider the various factors that our supreme court identified in *Kolupar v. Wilde Pontiac Cadillac, Inc.*, 2004 WI 112, ¶25, 275 Wis. 2d 1, 683 N.W.2d 58, as part of its determination of the appropriate attorney fees award for M&D on its contract claim.[6]

## CONCLUSION

¶81    For the reasons explained above, we reject the arguments Amarei makes with respect to the damages award, and we likewise reject his argument that the circuit court erroneously denied his request for a mistrial. As for M&D's cross-appeal, we conclude that the court erred, but only in part, with respect to

---

[6] Because we determine that the circuit court erred in part with respect to M&D's claim for prejudgment interest and collection costs under the terms of the Agreement, we need not address M&D's alternative argument about costs and fees pursuant to WIS. STAT. § 814.01.

M&D's request for prejudgment interest and collection costs, and we remand for further proceedings consistent with this opinion.

*By the Court.*—Order affirmed in part, reversed in part and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.